## AKERS v. ROWAN.

## SHAND v. CENTRAL NATIONAL BANK.

## SHAND v. ROWAN.

1. Where both parties appeal to the Supreme Court, the party who had the reply in the Circuit Court is also entitled to it on the hearing of the appeals.

2. Where an assignee under an assignment for the benefit of creditors seeks to recover money received by a creditor of the assignor from payments, assignments, and mortgages made by the assignor, the assignee must show that the assignor was insolvent at the time; that the creditor had reasonable cause to believe it; that the transactions were intended by the assignor to give a preference to this creditor; that the creditor had reasonable cause to believe that such transactions were made in fraud of the provisions of the assignment act; and that they took place within 90 days before the assignment for the benefit of creditors was executed.

3. As the assignment law of this State is not a bankrupt or insolvent law, the meaning of the terms "insolvent" and "insolvency" in our assignment act is not determined by the interpretation given to those words in the United States bankrupt act by the Supreme Court of the United States, and these words must be taken in their ordinary and popular signification, there being nothing in the act requring a different interpretation. So interpreted, they mean that condition in which a debtor is found when his property is insufficient to yield, under process of law, a fund sufficient to pay his debts.

4. Knowledge by the solicitor of a bank, who was also one of the directors, of the insolvency of one of the customers of the bank, cannot be imputed to the bank itself, where such knowledge was not acquired by this officer while acting for the bank, but confidentially as the attorney of the customer.

5. Where the assignee, the plaintiff, upon whom rests the burden of proof, fails to offer testimony to show knowledge by the defendant within 90 days of the assignment of the assignor's insolvency, except by showing that some suits had been brought against him and some drafts on him returned unpaid, and the defendant's officers and agents and other citizens testify that they had no such knowledge or belief, it cannot be held that defendant knew of the assignor's insolvency, or had reasonable cause to believe it.

6. A debtor gave a mortgage of a stock of goods in March and another mortgage in April on this same stock, or what remained of it, to secure the balance of this same debt, neither mortgage being put on

record, because the mortgagor had so requested. In July a third mortgage was given in like manner, and within ninety days thereafter the mortgagor made an assignment for the benefit of his creditors. *Held*, that the July mortgage could not be attacked, upon the ground that it had been given within the ninety days, as it was a mere substitution for valid securities, given more than ninety days before the assignment.

7. A mortgage of a stock of goods, including future additions, is valid; and, therefore, a renewal mortgage of the stock, including articles purchased since the date of the first mortgage, covers the same goods, and may be regarded as a mere substitution of securities.

8. Payments of money and assignments of accounts made by a debtor within 90 days of his assignment for the benefit of creditors, are not in fraud of the assignment act, where this money and these accounts represented the sale of goods which were covered by a mortgage executed several months before.

9. Goods covered by a chattel mortgage, after condition broken, may not be levied on under execution against the mortgagor; but if such mortgage had been given in fraud of the assignment act, it would be absolutely void, and such goods would be subject to levy for the debts of the mortgagor.

Before NORTON, J., Richland, October, 1889.

In this case the honorable W. H. Wallace, Judge of the Seventh Circuit, and the honorable I. D. Witherspoon, Judge of the Sixth Circuit, sat in the places of the Chief Justice and Mr. Justice McGowan, who were disqualified by reason of interest.

There were three actions: 1. Akers Brothers against S. W. Rowan, sheriff. 2. Robert W. Shand, assignee, against The Central National Bank. 3. Robert W. Shand, assignee, against S. W. Rowan, sheriff, The Central National Bank, and N. K. Fairbanks & Co.

The master's report was as follows:

The three actions above entitled were separately brought, but by a single order of reference were referred to me "to take the evidence and hear and determine all the issues, both of law and of fact," therein; and were, by consent of counsel, tried together, the same evidence being considered as offered in all the cases. A pressure of other matters prevents my discussing the evidence or stating my reasons for my findings and conclusions. I find the following to be the facts of the case:

1. That for a year or more prior to the month of March, 1886, J. S. Robbins, who is named as a party defendant in the action first above entitled, was engaged in the mercantile business in the city of Columbia as a wholesale and retail dealer in provisions, groceries, hay, &c., doing all of his banking business with the defendant, The Central National Bank of Columbia.

2. That he was permitted to overdraw his account in said bank from time to time, upon the security of bills of lading for merchandise at the various railroad depots in the city of Columbia, which were taken up by said bank, until, on the 16th day of March, 1886, such overdrafts amounted to nine thousand one hundred and eighty-five dollars ($9,185), when said bank advanced to him the further sum of eighteen hundred dollars ($1,800) to pay certain acceptances of his then maturing, taking therefor his note for the said eighteen hundred dollars ($1,800), and a chattel mortgage to secure the said note and the overdraft above mentioned, the bank surrendering its bills of lading, and he promising to deposit all his funds in the said bank, and to transfer to it as security certain bills and accounts; but he was to be allowed to check against his deposits for such sums as would be necessary to run his business, the net balance only of the deposits to go to the reduction of his overdraft, which it was expected would be paid up within forty days.

3. That on the 30th day of April, 1886, having reduced his overdraft to five thousand nine hundred and fourteen and 58-100 dollars ($5,914.58), but not having paid anything on the note, he gave a renewal note for the same amount, payable at thirty days, and executed a new mortgage as a renewal of the first one, which was surrendered to him, but was probably not marked satisfied or cancelled.

4. That both of these mortgages were executed in good faith by Robbins, and the officers of the bank had no reason to believe him to be insolvent, as he really was, but neither of the said mortgages was ever recorded, because it was so requested by him.

5. That during the month of May, 1886, Robbins became more and more embarrassed, many drafts upon him being returned dishonored, some of them through the Central Na-

tional Bank; and many suits were commenced against him, which was known to some of the officers of the bank.

6. That from the execution of the first mortgage he was required, in pursuance of his promise, to deposit all his funds in said bank, whether in the shape of cash or bills and notes, the net amounts going as payments on account of his said overdraft.

7. That from about the 15th day of June, 1886, the officers of the bank had reasonable cause to believe that Robbins was insolvent, in the legal sense of the term, but the payments and deposits made by him were made in pursuance of his previous promise, and in the regular course of his business with said bank, and they considered that they were requiring of him only what he was legally and morally bound by his promise to do.

8. That for the purpose of gaining time, Robbins employed counsel to stave off judgments in all of the suits against him, except in the case of N. K. Fairbanks & Co., which he seems to have inadvertently overlooked, having put the papers in his desk to hand to his counsel, which he forgot to do.

9. That on the 20th day of July, 1886, having reduced his overdraft to two thousand seven hundred and thirty-one and 39-100 dollars ($2,731.39), Robbins executed a new mortgage to secure the same, and a renewal of the eighteen hundred dollars note, such mortgage being intended as a renewal of the previous mortgages, and not as a change thereof; said mortgage, as the previous ones had done, covering all goods then in his store and at the several railroad depots, or elsewhere in the city of Columbia, and all goods to be thereafter acquired and added to said stock.

10. That in the interim between the date and maturity of the mortgage of the 30th of April, the stock of goods had been materially changed by sales and purchases, and Robbins had contracted some debts, which have not been paid. This is also true of the interim between the maturity of said mortgage and the execution of the mortgage of July 20th, 1886.

11. That in pursuance of the promise made when the Central National Bank surrendered the bills of lading held by it in March, Robbins, on the        day of August, 1886, transferred to said

bank certain of his book accounts, upon which considerable sums have since been collected by said bank.

12. That said accounts had not been transferred prior to the said day of August, 1886.

13. That in making such transfer of these accounts Robbins must be held to have intended the necessary consequences of his act, a preference to the bank over his other creditors, in fraud of chapter 72 of the General Statutes of 1882, and the bank had reasonable cause to believe that he so intended. The same would be true of the mortgage of the 20th July, if it stood as an isolated transaction, but I have already found that it was a renewal of the mortgage executed previous to the ninety days preceding the second day of September, 1886, and conferred no new rights.

14. That N. K. Fairbanks obtained an order for judgment in the case above referred to on the day of July, 1886, but did not enter up judgment or issue execution until the 30th day of August, having postponed doing so at the earnest solicitation of Robbins, although there was no collusion between them, and Robbins did not contribute in any way to the obtaining of said judgment or connive at their getting any advantage over their other creditors.

15. That, Robbins' condition steadily growing worse, said bank, on the thirtieth day of August, 1886, by S. W. Rowan, as its agent, seized under the mortgage of July 20th all the goods covered thereby that could be found; and at the same time said S. W. Rowan, as sheriff of Richland County, levied upon the same goods under the execution issued upon the judgment of N. K. Fairbanks & Co., and also levied under said execution upon a horse, wagon, and harness, and some money not covered by said mortgage.

16. That on the 2d day of September, 1886, Robbins executed and delivered to Robert W. Shand, Esquire, as assignee, a deed of assignment of all his property for the benefit of his creditors, without preferences, drawn strictly in accordance with the provisions of chapter 72 of the General Statutes of 1882.

17. That Robbins did not intend, by any of his transactions with the bank, to make a general assignment of his property for

the benefit of creditors, but intended only to secure said bank, and the officers of said bank were guilty of no act inconsistent with honesty and fair dealing, and supposed that they were requiring only what the bank had a legal and moral right to demand and receive.

18. That the plaintiffs in the action first above entitled are *bona fide* creditors of Robbins to the amounts alleged in the complaint therein.

I conclude, as matters of law :

1. That the two mortgages executed by Robbins in March and April, 1886, respectively, were valid, and having been executed more than ninety days previous to the execution of the deed of assignment, are not open to attack, even by the assignee.

2. That the terms "insolvent" and "insolvency" are used in chapter 72 of the General Statutes of 1882, as indicating "a condition of present inability to meet one's just obligations as they become due."

3. That the judgment in the case of N. K. Fairbanks & Co. *v.* J. S. Robbins, is valid as against all parties, but that the lien of the levy of the execution thereon did not attach to any of the goods covered by the mortgage to the bank ; and even if that mortgage should be set aside as against the assignee, it would not operate to give to that levy a lien which it has never possessed.

4. That the mortgage of July 20th, 1886, if standing as an isolated transaction, would have been avoided by the assignment of September 2d, 1886, but inasmuch as it was a mere renewal of the previous mortgages, and conferred no right or lien which the bank did not claim by virtue of the previous ones, it cannot be held to have given undue preference to the bank in fraud of chapter 72 of the General Statutes of 1882, and the bank is entitled to the proceeds of the sale of the mortgaged goods.

5. That inasmuch as the payments and deposits of money made by Robbins were made in his regular course of business, and in pursuance of a promise made previous to the ninety days preceding the assignment, they were not avoided by the assignment, and the assignee is not entitled to recover the amount thereof.

6. That the assignment of the accounts in August and all

transfers of notes, bills, and accounts between the fifteenth day of June, 1886, and the second day of September, 1886, although made in pursuance of a promise made more than ninety days preceding the assignment, were avoided by the said assignment, and the assignee is entitled to an accounting for the proceeds of collections thereon, and to have all uncollected turned over to him.

*The result of these conclusions is:*

I. That the complaint in the action first above entitled should be dismissed.

II. That the defendant, Samuel W. Rowan, as sheriff of Richland County, should apply to the execution of N. K. Fairbanks, & Co. the proceeds of the sale of the horse, wagon, and harness, and money levied upon.

III. That the order of injunction restraining S. W. Rowan, as against The Central National Bank of Columbia from paying over to the said bank the proceeds of the sale of the mortgaged goods, should be dissolved.

IV. That said The Central National Bank of Columbia should account to Robert W. Shand, as assignee, for the proceeds of all collections from notes, bills, or accounts transferred to it by Robbins between the fifteenth day of June, 1886, and the second day of September following; and also for any balance of the proceeds of the sale of the mortgaged goods after satisfying the debt secured by the mortgage.

The Circuit decree was as follows:

These three cases were heard together before the master, who makes one report on them, and they come before me on exceptions to the findings of fact and conclusions of law in the two cases last above entitled. There being no exceptions to the report on the part of Akers & Bros. *et al.*, plaintiffs in the suit first above entitled, the report must be confirmed as to them, and their complaint in that action is hereby dismissed with costs.

I will here discuss only the points as to which I differ with the master.

First. The master fixes the 15th day of June, 1886, as the date when the Central National Bank had notice of the insolven-

cy of Robbins.   In this, my conclusion is, that he erred, and my finding is, that the bank had such notice for the whole period of ninety days preceding the 2nd day of September, 1886, the date of assignment—that is, from the 4th day of June, 1886, inclusive—his actual insolvency having existed when he executed the mortgage in March, and continued up to the assignment.   If the master's definition of the term "insolvency" is correct, *i. e.,* that it is "a condition of present inability to meet one's just obligations as they become due," it follows, as the night the day, that the bank knew of it when the first mortgage was taken, and its board of directors refused to allow his overdraft to stand, except upon such conditions as deprived him of ability to pay any other debt without its consent.   I do not think, however, that our courts have adopted so harsh a construction, and my own opinion is, that an insolvent debtor is one who does not own a sufficiency of property, when reduced to cash by the ordinary legal processes, to pay his debts with accrued costs and interest.

But in the view I take of the case, it is not necessary for me to decide this, as, in my opinion, Robbins was insolvent for the period named in any sense of the term, and the bank had reasonable cause to believe him so prior to the 4th day of June, 1886. In March he owed the bank $9,185, and to get $1,800 more, he mortgaged all that he had, and all that he expected to get, in the shape of goods and merchandise, and promised to assign all his choses in action, stipulating that at its pleasure only he might use some money in the conduct of his business.   He failed to pay up his indebtedness within the time stipulated, and on the 30th day of April, 1886, gave a new mortgage to secure the balance. Neither of these mortgages was recorded, because he requested that they should not be, and this was known to the president and board of directors.   Prior to the 4th day of June, numerous suits were commenced against him, and were defended only for the purpose of delay.   Col. John T. Sloan, jr., one of the directors of the bank and its solicitor, knew of these facts, and filed the answer for Robbins; and in argument it is urged that he did not, and could not, communicate his knowledge to the bank on account of his relations to Robbins; but Robbins had employed him, knowing him to be a director of the bank and the solicitor

through whom the bank acted in taking the several mortgages. Notice to Sloan in these capacities is notice to the bank; in such matters the director is the bank. Suppose Robbins had owed Sloan as an individual, and had given him the same information as an attorney. Could Sloan, the individual, have said that he was ignorant of the knowledge that Sloan, the attorney, had? Surely not. Nor can Sloan, the bank, claim to be ignorant of the knowledge of Sloan, the attorney. Moreover, the bank itself had for collection, and returned unpaid, many claims against Robbins prior to the fourth day of June, and it is held to knowledge of those facts; for although such acts may have been performed by subordinate officers, the acts of such officers, within the scope of their employment, are the acts of the bank. In this case, the acts of the subordinate officers were entered of record on the books of the bank, and were reported to its cashier, the chief executive officer thereof. Notice to a subordinate officer may not be notice to the bank, but when, by a subordinate officer, it performs an act, it is clearly the act of the bank, which it is bound to know.

Second. The master found that the payments made by Robbins within the ninety days preceding his assignment were made in the regular course of his business, and concluded that they were therefore valid as against his assignee. Payments made under the circumstances detailed by all of the witnesses could not be said to have been in the regular course of a merchant's business, and I find that they were not. But even if so made, the fact would be pertinent only to the inquiry whether the bank had reasonable cause to believe him to be insolvent, and I have found that it had such grounds from other evidence. The statute makes no exception in favor of any payments, but is applicable to all made under the circumstances named in the statute. Such payments were preferences in fraud of the act, and are void as against the assignee.

Third. The master found that the mortgage of July 20th, 1886, was a mere renewal of the previous ones, and concluded that therefore it did not confer a preference in fraud of the act. I find that it was not a mere renewal, and that it did confer additional rights upon the bank. The forty days allowed by law for

the recording of the mortgage of April 30th, 1886, had expired on the ninth of June, and as to all subsequent creditors and purchasers it had ceased to exist as a lien, although there was a possibility of its being instilled with new life and becoming a new lien by being recorded. The mortgage of July 20th gave then to the bank what it did not then hold as to such creditors who are now represented by the assignee. It comes directly under the provisions of the act, and must be held to have been avoided by the assignment, although good as between the parties.

Fourth. The master found as matter of fact that the levying of the execution of N. K. Fairbanks & Co. and the seizure by the sheriff of the goods and effects of Robbins were contemporaneous. In this I concur, but I cannot agree with the master that in the event of the mortgage given to the bank being set aside, it would not give Fairbanks' levy a lien on the goods covered by said mortgage. I hold that the property of Robbins, so far as Fairbanks was concerned, was as if no mortgage whatever was on the property, and there is no reason why the levy was not good to the amount of the judgment. It is therefore ordered, adjudged, and decreed,

1. That the report of the master be, and the same is hereby, confirmed in all respects in which it is not hereby modified.

2. That the defendant, the Central National Bank of Columbia, do account before the master for all sums paid to it by Robbins on account of prior indebtedness, from the fourth day of June, 1886, up to the time of his assignment, and for the proceeds of all notes, bills, drafts, accounts, or other evidences of indebtedness assigned or turned over to it by him within said period, except in so far as it may have paid him actual cash or its equivalent therefor at the time of such assignment or transfer; and that it do also account for all goods and merchandise or other things of value turned over to it within the same period under like circumstances, together with interest on all such sums.

3. That Samuel W. Rowan, Esq., as sheriff of Richland County, do apply the proceeds of the sale of the mortgaged goods in his hands first to the satisfaction of the execution of N. K. Fairbanks & Co., and then pay over the balance to the plaintiff, Robt. W. Shand, as assignee of J. S. Robbins.

4. That N. K. Fairbanks & Co. have their costs of the action out of the plaintiff, and that the plaintiff have his costs of both actions out of the defendant, The Central National Bank of Columbia.

The Central National Bank appealed on the following grounds:

1. Because his honor erred in finding that the bank had notice of the insolvency of Robbins for the whole period of ninety days (90) preceding the 2nd day of September, 1886, the date of the assignment; that is, from the 4th day of June, 1886, inclusive, and that his actual insolvency existed when he executed the mortgage in March and continued up to the assignment, and that the said bank had reasonable cause to believe so prior to the 4th day of June, 1886.

2. Because his honor erred in finding that there was a stipulation between Robbins and the bank to the effect that at his pleasure he might use some money in the conduct of his business.

3. That his honor erred in not finding that the answers for Robbins were filed by Messrs. Pope & Shand and John T. Sloan, jr., instead of finding as he did that they were filed by John T. Sloan, jr.

4. Because his honor erred in finding that the suits brought against him were defended only for the purpose of delay.

5. Because his honor erred in finding that John T. Sloan, jr., had notice of the insolvency of Robbins, both as a solicitor and director of the bank, and that notice to him in these capacities is notice to the bank.

6. Because his honor erred in finding that Sloan was the bank, and that, as such, he could not be ignorant of the knowledge of Sloan, attorney.

7. Because his honor erred in finding that the act of a subordinate officer is an act of the bank, which it is bound to know.

8. Because his honor erred in finding that the payments made by Robbins to the bank within ninety (90) days of his assignment were not made in the regular course of a mercantile business, and that such payments were preferences to it as against the assignee.

9. Because his honor erred in finding that the mortgage of

July 20th, 1886, was not a mere renewal, and that it did confer additional rights upon the bank.

10. Because his honor erred in finding that the forty (40) days allowed by law for the recording of the mortgage of April 30, 1886, had expired on the ninth of June, and as to all subsequent creditors and purchasers it had ceased to be a lien.

11 That his honor erred in finding that the mortgage of July 20th gave then to the bank what it did not have then as to such creditors who are now represented by the assignee, and that it comes directly under the provisions of the act, and must be held to have been avoided by the assignment, although good as between the parties.

12. Because his honor erred in finding that the property of Robbins, so far as Fairbanks & Co. are concerned, was as if no mortgage whatever was on the property, and there is no reason why a levy was not good to the amount of the judgment.

13. Because his honor erred in not confirming the exceptions before the master in his report numbered one, two, three, four, five, six, seven, eight, nine, and ten.

14. Because his honor erred in ordering that the report of the master be confirmed in all respects in which it is not modified by his decree.

15. Because his honor erred in ordering that the Central National Bank of Columbia do account before the master for all amounts paid to it by Robbins on account of the prior indebtedness from the 4th day of June, 1886, up to the time of his assignment, and for the proceeds of all notes, bills, and accounts, or other evidences of indebtedness assigned or turned over to it by him before said period, except in so far as it may have paid him actual cash, or its equivalent, from time to time on such assignment or transfer, and that it do also account for all goods and merchandise and other things of value turned over to it within the same period under like circumstances, together with interest on all such sums.

16. Because his honor erred in ordering that S. W. Rowan, Esq., as sheriff of Richland County, do apply the proceeds of the mortgage in his hands, first, to the satisfaction of execution of Fairbanks & Co., and then pay over the balance to R. W.

Shand, as assignee of J. S. Robbins; and because he did not order that such proceeds be applied by said sheriff to the mortgage of the defendant, the Central National Bank of Columbia.

17. Because his honor erred in ordering that the plaintiff have his costs of both actions out of the defendant, the Central National Bank of Columbia, and because he did not dismiss the complaint as to this defendant with costs against the plaintiff.

18. Because the decree of his honor is, in all respects, from beginning to end, as to the rights of this defendant, contrary to the law of the case and the evidence adduced before the master.

Plaintiff's grounds of appeal were as follows:

1. Because his honor erred in not agreeing with the master that in the event of the mortgage given to the bank being set aside it would not give Fairbanks' levy a lien on the goods covered by the mortgage.

2. Because his honor erred in holding that the property of Robbins, so far as Fairbanks was concerned, was as if no mortgage whatever was on the property, and that there is no reason why the levy was not good to the amount of the judgment.

3. Because his honor erred in adjudging that Samuel W. Rowan, Esq., as sheriff of Richland County, do apply the proceeds of the sale of the mortgaged goods in his hands to the satisfaction of the execution of N. K. Fairbanks & Co.

4. Because his honor erred in adjudging that N. K. Fairbanks & Co. have their costs of the action out of the plaintiff.

When the case was called for hearing in this court, the point was raised as to who had the reply. The court ruled that as both parties had appealed, the plaintiff, who had the reply on Circuit, was also entitled to the opening and reply in this court.

*Messrs. Clark & Muller* and *Lyles & Haynsworth*, for plaintiff.

*Mr. John T. Sloan, jr.*, for the Bank.

*Messrs. Marshall & Weston*, for Fairbanks & Co.

October 22, 1890. The opinion of the court was delivered by

MR. JUSTICE MCIVER. There being no appeal from the judgment dismissing the complaint in the case first above stated, it may be dismissed from further consideration. It remains, therefore, only to consider the appeals in the other two cases.

It appears that one J. S. Robbins, who had for a year or more previous to the transactions here brought under review been engaged in the mercantile business in the city of Columbia, on the 2nd of September, 1886, made a general assignment for the benefit of his creditors to the plaintiff, Shand, in conformity to the provisions of chapter 72 of the General Statutes of 1882, and these two actions were brought by him as such assignee, the one to require the bank to account for certain payments alleged to have been made by Robbins to the bank on pre-existing indebtedness and certain assignments of sundry choses in action alleged to have been made by said Robbins to said bank as a security for such indebtedness; and the other to require Rowan, the sheriff, to pay over to plaintiff the proceeds of the sale of the goods and chattels of said Robbins, which had been seized and sold by him, as well under a mortgage executed by Robbins to the bank, as under an execution issued to enforce a judgment recovered by Fairbanks & Co. against said Robbins. These claims thus made are based upon the allegation that the payments and assignments above referred to, as well as the mortgage to the bank, were made within ninety days before the execution of the deed of assignment, and, as against the same, are void under the provisions of section 2015 of the General Statutes, but that the mortgage, being good and valid as between the parties to it, Fairbanks & Co. could acquire no lien on the mortgaged property under a judgment entered after condition broken, and hence that plaintiff was entitled to the entire proceeds of the sale of the mortgaged property.

To establish these claims on the part of the plaintiff, it is necessary for him to show: 1st. That Robbins was insolvent at the time of the transactions had with the bank, here sought to be avoided. 2nd. That these transactions were entered into by Robbins "with a view to give a preference to the bank." 3rd. That the bank had "reasonable cause to believe" that Robbins

was insolvent at the time. 4th. That the bank had "reasonable cause to believe" that such transactions were made by Robbins "in fraud" of the provisions of chapter 72 of the General Statutes. 5th. That these transactions took place within ninety days before the execution of the deed of assignment.

To determine whether the plaintiff has succeeded in establishing all of these material facts, a brief statement of the several transactions between the bank and Robbins, as developed by the testimony, will be necessary, though the same will be found more fully stated in the report of the master and the decree of the Circuit Judge, both of which should be incorporated in the report of this case. It seems that from the first Robbins was permitted to overdraw his account with the bank, upon the security of bills of lading, deposited with the bank, for merchandise purchased by Robbins. This course of business continued until the 16th of March, 1886, when it was found that the overdrafts amounted to something over nine thousand dollars, and on that day the bank loaned Robbins on his own note the further sum of $1,800 to pay certain acceptances of his then maturing in another bank, and took from him a mortgage on his stock of goods then in the store, as well as all that might thereafter be acquired, to secure said loan as well as the amount of the overdrafts above mentioned, and surrendered the bills of lading; the understanding being that Robbins would deposit all his funds in the bank and transfer to it as further "security certain bills and accounts," he being allowed to check against his deposits "for such sums as would be necessary to run his business," the balance going to the reduction of his overdrafts, "which it was expected would be paid up within forty days."

This course of business seems to have continued until the 30th of April, 1886, when it appeared that Robbins had reduced his account for overdrafts something over $3,000, but had paid nothing on the note for $1,800, and on that day he gave a renewal note for the same and "executed a new mortgage as a renewal of the first one, which was surrendered to him, but was probably not marked satisfied or cancelled." This mortgage was of the same tenor and form as the former one, but neither of them were

30—33

ever recorded, because Robbins requested that they should not be put upon record as it would injure his credit.

During the month of May the creditors of Robbins commenced bringing suits against him, the earliest having been commenced on the 14th of that month, but none of these suits were carried into judgment until after the transactions here brought in question occurred; and the testimony tends to show that service was accepted in most if not all of these cases, with a view to prevent its being known. At all events, there is no evidence that the bank knew anything of these suits before the last mortgage was taken, unless the notice to Sloan can be regarded as notice to the bank, which will hereinafter be considered. It is true, the cashier, Sawyer, does say in his testimony: "We knew that pressure had been brought to bear by some of his creditors, but we had confidence in his ability to pay us; we had no uneasiness." But he does not say when this knowledge was acquired—whether before or after the last mortgage was taken, and the payments and assignments complained of had been made. So, too, there is a want of definiteness as to the time when the drafts drawn on Robbins through the bank commenced to go back, and the amounts of such drafts. The cashier offered in his testimony to prepare a list of the drafts sent back, but it does not appear that any such list was ever called for by plaintiff. It also appears that Robbins employed counsel to appear in all the suits brought against him except that of Fairbanks & Co., which seems to have been inadvertently overlooked. The result was that none of these cases were put in judgment until after the deed of assignment was executed, except that of Fairbanks & Co., in which judgment was entered on 30th of August, 1886, though the order for judgment was obtained some time in July, but at what precise date does not appear, though the inference is that it was in the latter part of the month, probably after the last mortgage to the bank was executed. One of the counsel thus employed by Robbins was Mr. Sloan, who was then solicitor of the bank and also one of the directors; and one of the questions in the case is whether his knowledge, thus acquired, can be imputed to the bank.

On the 20th of July, 1886, Robbins having reduced his account for overdrafts to about the sum of $2,700, but having paid

nothing on the $1,800 note, executed a new mortgage on his stock of goods then on hand, as well as such as he might thereafter acquire, to secure these two amounts; and some time in August, 1886 (the precise date not being stated), Robbins, in pursuance of the arrangement made in March, 1886, when the bank surrendered the bills of lading, transferred to the bank certain of his book accounts, upon which considerable sums have been collected by the bank. On the 30th of August, 1886, the bank, through its agent, the defendant Rowan, seized the stock of goods in the store of Robbins, the said Rowan, as sheriff, at the same time levying on said stock, as well as a horse, wagon, and harness, together with some money found in the store; and all the property so seized and levied on, except the money, was sold by said Rowan, who now holds the proceeds subject to such decree as may be made herein.

The master, to whom all the issues were referred, found amongst other things, as matter of fact, that from about the 15th of June, 1886, the bank had reasonable cause to believe that Robbins was insolvent, in the legal sense of the term, but the payments and deposits made by him were made in pursuance of his previous promise, and in the regular course of his business with the bank, who considered that they were requiring of him only what he was legally and morally bound by his promise to do; that between the date and maturity of the mortgage of 30th of April, as well as between the date and maturity of the mortgage of 20th of July, the stock of goods had been materially changed by sales and purchases, and Robbins had contracted debts which have not been paid; that the mortgage of 20th of July was intended as a renewal of the previous mortgages and not as a change thereof; that the officers of the bank were guilty of no act inconsistent with honesty and fair dealing, and supposed that they were requiring from Robbins only what they had a legal and moral right to demand; and that the judgment of Fairbanks & Co. was obtained without any collusion or connivance with, or on the part of, Robbins, who did not contribute in any way to the obtaining of said judgment; and as matter of law he found, amongst other things, that the term "insolvent" and "insolvency," as used in chapter 72 of the General Statutes, signify

"a condition of present inability to meet one's just obligations as they become due;" that the mortgage of 20th of July being a mere renewal of the previous mortgages, and conferring no right or lien which the bank did not claim by virtue of the previous ones, it cannot be held to have given any preference to the bank in fraud of the provisions of chapter 72 of the General Statutes, and hence that the bank is entitled to the proceeds of the sale of the mortgaged goods; that inasmuch as the payments and deposits of money made by Robbins to and with the bank, were made in his regular course of business, and in pursuance of a promise made previous to the ninety days preceding the assignment, they were not avoided by the assignment, and hence the assignee is not entitled to recover the same; that the assignment of the accounts and other choses in action made in August, although made in pursuance of a previous promise, made before the ninety days commenced to run, were avoided by the assignment, and the assignee is entitled to an accounting for the same; and that the judgment of Fairbanks & Co. is valid as against all the parties, but that the lien secured by the levy of the execution did not attach to any of the goods covered by the mortgage, and even if such mortgage should be held void, as against the assignee, this would not operate to give such execution a lien on the goods embraced in the mortgage.

To this report all parties excepted, and the case having been heard by his honor, Judge Norton, he held, amongst other things, 1st, that the master erred in fixing the 15th of June as the date when the bank had notice of the insolvency of Robbins, and, on the contrary, his conclusion was that the bank had reasonable cause to believe that Robbins was insolvent, not only in the rigid sense of that term adopted by the master, but also in any sense of that term, prior to the 4th of June—the day on which the ninety days commenced to run—and in fact he seems to think that the bank had reasonable cause to believe that Robbins was insolvent even in the more restricted sense of that term, which he seems to prefer to that adopted by the master, viz.: "that an insolvent debtor is one who does not own a sufficiency of property, when reduced to cash by the ordinary legal processes, to pay his debts with accrued costs and interest," as far back as March,

1886, when the first mortgage was given. 2nd. That the master erred in holding that the payments made to the bank by Robbins within the 90 days prior to the execution of the deed of assignment, were made in the regular course of business; but even if so made, they might still be avoided, by the fact that the bank had, at the time, reasonable cause to believe that he was insolvent. 3rd. That the master erred in finding that the mortgage of 20th of July was a mere renewal of the previous mortgages. 4th. That the master erred in holding that even if the mortgage of the bank be set aside, this would not give Fairbanks & Co. a lien on the goods embraced in the mortgage, by virtue of their levy thereon.

Judgment was accordingly rendered, in pursuance of these views, and from that judgment both the plaintiff and the Central Bank appeal, raising the several questions which will now be considered; and first the appeal of the bank.

If the terms "insolvent" and "insolvency," as used in our assignment law, can be properly interpreted as signifying "a condition of present inability to meet one's just obligations as they become due," or, to express it in other words, "a present inability to pay debts as they mature in the ordinary course of business," then it seems to me clear that the conclusion adopted by the Circuit Court must be affirmed, unless it appears that the transactions between the bank and Robbins, within the 90 days preceding the execution of the deed of assignment, should properly be regarded as mere renewals or exchanges of securities acquired by the bank prior to the commencement of the currency of the 90 days.

I propose, then, to inquire first, whether that is the proper construction of the terms "insolvent" and "insolvency" as used in our assignment law. So far as I am informed, we have no case in this State which authoritatively adjudicates this question, and none such has been cited. On the contrary, reliance is placed mainly, if not entirely, upon the fact that the Supreme Court of the United States has placed such an interpretation upon those terms as used in the U. S. bankrupt law, and under the rule that when one sovereignty adopts an enactment of another, the interpretations of its law by the latter is usually ac-

cepted by the former, it is contended that the same interpretation should be given to those terms as used in our assignment law. While I do not propose to controvert the correctness of this general rule, or to indicate any of the qualifications to which it is subject, I do not think it is applicable to the present case, for the simple reason that our assignment law cannot be regarded as in any sense a bankrupt or an insolvent law. Burrill on Assignments (4th edit.), sec. 47, p. 67 ; *Mayer* v. *Hellman*, 91 U. S., 496 ; *Beck* v. *Parker*, 65 Penn. St., 262 ; s. c., 3 Am. Rep., 625.

Hence, it seems to me, that the rule does not require us to adopt the construction which the courts of one sovereignty have placed upon the terms of an act adopted for one purpose, in construing our act adopted for a different purpose, even though some of the terms used in both acts may be practically the same. On the contrary, as I understand it, one of the primary rules in the construction of a statute is, that the words used therein should be taken in their ordinary and popular signification, unless there is something in the statute requiring a different interpretation. Cooley Con. Lim., 58, 59 ; Pott. Dwar. Stat., 127, 622. This is really nothing more than a rule of common sense, for it must be supposed that the legislature in enacting a statute intended that the words used therein should be understood in the sense in which they are ordinarily and popularly understood by the people for whose guidance and government the law was enacted, unless there is something in the statute showing that the words in question were used in some other sense.

Now, it cannot be denied that the usual and popular signification of the terms "insolvent" and "insolvency" is not that which it is here proposed to attribute to them ; but, on the contrary, those terms are generally used to denote "an insufficiency of the entire property and assets of an individual to pay his debts," and this is admitted by Field, J., in *Toof* v. *Martin* (13 Wall., at page 47), to be the "general and popular meaning" of those terms. It seems to me, therefore, that this is the proper interpretation to be given those terms in our assignment law, as I am unable to find anything in that statute indicating an intention that a more rigid and narrow interpretation should be given to

them. Especially should this be so when, so far as I am informed, there is no instance where the courts of this State have shown any disposition to give to the terms "insolvent" and "insolvency" any such narrow and rigid interpretation as that adopted by the Supreme Court of the United States in construing their bankrupt law. On the contrary, so far as I am informed, our courts, whenever called upon to consider the question of insolvency in any form, have invariably treated it as that condition in which a debtor is found when his property is insufficient to yield a fund sufficient to pay his debts through the agency of the process of law. It seems to me, therefore, that the fundamental error on this branch of the case, is in imparting to the terms "insolvent" and "insolvency" a more narrow and rigid interpretation than they should bear.

It is true that the Circuit Judge, while not expressly overruling the master's conclusion of law, as to the proper signification of those terms, does express his preference for the signification which I have adopted, but holds that in any sense of those terms Robbins was insolvent and that the bank had reasonable cause to believe him to be so at the time the transactions here sought to be avoided were entered into. Without stopping to inquire when Robbins became insolvent, in the proper sense of that term—a matter as to which the testimony seems to be very indefinite— and assuming, for the purpose of this inquiry, that Robbins was insolvent at that time, the important question still remains whether the bank then had reasonable cause to believe him to be so. The Circuit Judge seems to base his conclusion as to this question upon two points : 1st. The fact that Col. Sloan being the solicitor of the bank and one of its directors, and knowing that a number of suits had been brought against Robbins, his knowledge must be imputed to the bank. 2nd. That drafts drawn on Robbins through the bank had been returned unpaid prior to the 4th of June, and the bank must be held to knowledge of those facts, as they were entered on the books of the bank and reported to the cashier by the collection clerk, Berg.

As to the first of these points, it seems to me that the Circuit Judge overlooked the qualifications to the admitted general rule that notice to the agent is notice to the principal. Sloan, though

he was at the time the solicitor of the bank and one of its directors, did not acquire knowledge of the fact that suits were commenced against Robbins while acting in either of those capacities. On the contrary, he acquired it as the attorney of Robbins, and therefore, so far from being under any obligation to communicate such knowledge to the bank, it would have been a violation of the professional confidence reposed in him by Robbins for him to have done so. The manifest purpose of Robbins was "to stave off" action by his creditors, and to conceal, as far as practicable, the fact that he was being sued, and hence it would have been a clear breach of confidence on Sloan's part to have communicated to the bank knowledge that he had acquired as the attorney of Robbins, and it cannot for a moment be assumed that he had done so.

As is well said by Bradley, J., in the case of "The Distilled Spirits," 11 Wallace, at page 367 : "The general rule that a principal is bound by the knowledge of his agent, is based upon the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject matter of negotiation, and the presumption that he will perform that duty. When it is not the agent's duty to communicate such knowledge, when it would be unlawful for him to do so, as, for example, when it has been acquired confidentially as attorney for a former client in a prior transaction, the reason of the rule ceases, and in such a case an agent would not be expected to do that which would involve the betrayal of professional confidence and his principal ought not to be bound by his agent's secret and confidential information." See also *Wickersham* v. *Chicago Zinc Company*, 18 Kans., 481 ; s. c., 26 Am. Rep., 784 ; *First National Bank of Hightstown* v. *Christopher*, 11 Vroom (N. J.), 435 ; s. c., 29 Am. Rep., 262 ; *Fairfield Savings Bank* v. *Chase*, 72 Me., 226 ; s. c., 39 Am. Rep., 319 ; especially the note to the last named case, where there is an elaborate review of the authorities, both English and American. See also 2 Pom. Eq. Jur., secs. 666–676, and the cases there cited. These authorities show beyond all dispute, that the conceded general rule that notice to the agent is notice to the principal, is subject to qualification, and that though an attorney or director of a corporation may be

its agent, yet knowledge which such an officer has acquired while acting for himself or for a third person, and not for the corporation, cannot be imputed to his principal; and more especially is this so where such knowledge cannot be communicated to the principal without a breach of confidence on the part of the agent. I think it is clear, therefore, that any knowledge which Sloan acquired when acting as attorney for Robbins cannot be imputed to the bank.

As to the second point upon which the Circuit Judge seems to rely to sustain his conclusion that the bank had reasonable cause to believe Robbins was insolvent prior to the 4th of June, to wit, the fact that many drafts drawn on him through the bank were sent back unpaid, it does not seem to me that there is any sufficient evidence to sustain it.  The testimony upon this subject comes mainly from the collection clerk, Berg, and his testimony is very indefinite, as well as to the amounts of the drafts, as to their number, and when they were sent back; and when we find that the cashier had offered to prepare a list showing these facts, and that no such list appears to have been called; and when we remember that it was incumbent upon the plaintiff to prove such facts as would warrant the inference that the bank had reasonable cause to believe Robbins to be insolvent, it does seem that there is a failure of testimony as to this point.  I can very well understand how the sending back of a single draft might be sufficient to warrant such an inference, if the interpretation placed upon the words "insolvent" and "insolvency" by the Supreme Court of the United States in construing their bankrupt law should be adopted as the proper interpretation of those words as used in our assignment law.  But it is somewhat difficult to perceive how the fact that the drafts were returned unpaid, or even that some of the creditors of Robbins had brought suits against him, would require or even warrant the inference of "insolvency" in what I regard the proper sense of that term.  It seems to me that it was incumbent on the plaintiff to prove something more than this before he could fix upon the bank knowledge or even reasonable cause to believe that Robbins was insolvent; especially in view of the undisputed and undisputable testimony of the president, cashier, and several of the directors that they had no

such knowledge and entertained no such belief, in addition to the testimony of several prominent business men in the city to the same effect. I do not think, therefore, that there is any testimony at all sufficient to warrant the inference that the bank either knew or had reasonable cause to believe that Robbins was insolvent, in the proper sense of that term, when the last mortgage was taken.

But even if I am in error in this, it seems to me that the mortgage may be sustained upon the ground taken by the master—that it was a mere renewal of former securities. It appears that from the commencement of the dealings between the bank and Robbins, the former held securities for such indebtedness as the latter might incur, first in the shape of the bills of lading, which were surrendered when the security was converted into the form of a mortgage, with a pledge on the part of Robbins to transfer to the bank certain choses in action, then the first mortgage was renewed by the mortgage of the 30th of April, which was in turn renewed by that of the 20th of July, which is here brought in question. So that in fact the preference given to the bank was as far back as March, 1886, when it is conceded that it is lawful, and I confess I do not see how the subsequent transactions can be regarded as anything more than a renewal or exchange of securities which when originally taken must be regarded as lawful; and it is especially difficult to see how such subsequent transactions can be regarded as preferences given in fraud of the provisions of section 2015 of the General Statutes, when their manifest purpose was not to give them any preference, but simply to change the form of those previously given. Such renewals or exchange of securities, even when made within the time limited, have been sanctioned even under the stringent construction placed upon the bankrupt law by the Supreme Court of the United States. *Burnhisel* v. *Firmar*, 22 Wall., 170 ; *Clark* v. *Iselin*, 21 *Id.*, 360.

It is contended, however, that the mortgage of 20th of July cannot be regarded as a mere renewal of that of the 30th of April, because it covered property other than that embraced in the previous mortgage, the point being, as I understand it, that while the mortgage of the 30th of July covered all of the goods in the store at that date, which included any additions to the stock made

after the maturity of the mortgage of 30th of April, while such additions would not be covered by the April mortgage. I do not see the foundation for this position. It is settled in this State at least, that a mortgage of after-acquired property is good and valid, unless rendered invalid by some other cause, and that the lien of the mortgage attaches so soon as the property is acquired by the mortgagor (*Parker* v. *Jacobs*, 14 S. C., 112), and, so far as the present inquiry is concerned, I do not see that it makes any difference whether such lien is a legal or an equitable lien, for in either aspect it may be enforced by the mortgagee. So that if the bank, instead of taking a new mortgage on the 20th of July, had on that day put the April mortgage on record, I do not see why a lien would not then have been acquired upon the same property as that embraced in the July mortgage—the terms of the two mortgages being the same. *Loan & Trust Co.* v. *McPherson*, 26 S. C., 431.

As to the payments and assignments of the bills, notes, and accounts to the bank, it seems to me that if the mortgage of 20th of July be sustained, they should be also, no matter at what time made, for being the proceeds of the sales of the mortgaged property—the stock of goods—they could in no proper sense be regarded as payments or assignments made in fraud of the assignment act.

Next as to the plaintiff's appeal. Although under the view which I take of the case, this cannot be regarded a practical question, inasmuch as if the mortgage of 20th of July be sustained, there can be no doubt that it has priority over the judgment of Fairbanks & Co., yet it may be proper to consider the question in another aspect of the case. I agree in the view taken by the Circuit Judge as to this matter. If the mortgage is void, then it must be regarded as a mere nullity, without ever having had any vitality or lien, and if so, then I see no reason why the lien acquired by the levy of the Fairbanks execution, prior to the execution of the deed of assignment, should not be allowed its priority. The assignment does not declare the mortgage voidable at the instance of the assignees, or that it shall be regarded as void, as against the assignee, but it declares that a mortgage given under the circumstances mentioned "shall be void," and if so,

then, as the Circuit Judge very properly says, the case must be considered as if no mortgage had ever been given.

The cases of *Reed* v. *McIntyre*, 98 U. S., 507, and *Boese* v. *King*, 108 *Id.*, 379, cited to sustain the view contended for by plaintiff, are not in point. In the former the judgment was not recovered until after the deed of assignment was executed, and as that deed never was declared void, as made with intent to hinder and delay creditors, the fact being admitted that there was no such intent, but was simply superseded by consent by the proceedings in bankruptcy, it followed necessarily that the judgment never could have acquired any lien upon the property in question, as it had passed out of the debtor by a valid deed before the judgment was recovered. In the other case the debtor, on the 25th of March, 1873, made an assignment under the statute of New Jersey which, unlike our statute, contained a provision barring the claims of all creditors who shall come in under the assignment and claim a dividend out of the assigned assets, without reference to the fact of whether they executed releases or not, thus imparting to that statute the distinctive feature of a bankrupt or insolvent law, and the judgment there in question was not recovered until 3rd of February, 1876—more than two years after the assignment was executed, and after the expiration of the time within which the assignment could be attacked under the provisions of the bankrupt act. It is clear, therefore, that in that case the assignment, which never had been set aside, and which under the facts found in that case—to wit, that it was not made with intent to hinder, delay, or defraud creditors—never could have been set aside, except possibly by a proceeding in bankruptcy, if instituted in due time, and which was prior in date to the judgment—was entitled to priority. The real point of controversy in that case was whether the assignment confessedly made under the provisions of a statute containing a feature which imparted to it the character of an insolvent or bankrupt law, was not absolutely void *ab initio*, because made under a statute of the State which had been superseded and suspended by the passage of the United States bankrupt law; and so the minority of the court, consisting of four, held; while the majority held that the whole act was not superseded, but only that feature of it impart-

ing to it the character of an insolvent law. The other case of *Smith* v. *Brainerd* (37 Minn., 479), cited to sustain plaintiff's appeal, I have not had access to, but it is sufficient to say that it is not authority binding on this court.

The judgment of this court is, that the judgment of the Circuit Court, in so far as it conflicts with the views herein announced, be reversed, and that in all other respects it be affirmed, except that the costs of the two actions last above stated should be paid out of the assets of the assigned estate in the hands of the plaintiff.