WATERMAN, Justice.
In this appeal, we review an evidentiary ruling and summary judgment ending a lawsuit by a student who failed to meet academic requirements in medical school and sued the school for failing to accommodate her mental disability. The student was treated for depression by a staff psychotherapist during the school year but did not give consent to allow the psychotherapist to discuss her depression with the faculty. Nor did the student inform the academic decision-makers of her depression until mid-December, after she had *796 failed a required class and performed poorly on other classes her first semester. Several accommodations were provided or offered, but she failed another required class the second semester and again performed badly on other courses. The medical school expelled her based on her failing grades and lack of academic promise.
The student filed a complaint against the medical school with the Iowa Civil Rights Commission and then filed this district court action alleging the school failed to accommodate her mental disability. She filed an evidentiary motion to impute her psychotherapist's knowledge of her depression to the school's academic decision-makers. The district court applied statutory confidentiality requirements for mental health information to deny her motion, finding the student had not waived the privilege, and granted the school summary judgment on her failure-to-accommodate claim. We retained her appeal.
For the reasons explained below, we hold the district court correctly declined to impute the psychotherapist's knowledge to the medical school's academic decision-makers. We also conclude based on the undisputed facts that the failure-to-accommodate claim failed as a matter of law. The student could not show the medical school denied any reasonable accommodation she requested or that any reasonable accommodation existed that would have allowed her to meet the school's academic standards. Accordingly, we affirm the district court's evidentiary ruling and summary judgment.
I. Background Facts and Proceedings.
In August 2014, Natalie Slaughter started her first year of medical school at Des Moines University College of Osteopathic Medicine (DMU). Almost immediately, she struggled academically. Slaughter soon came to the attention of the Academic Progress Committee (APC), a faculty committee that monitors student academic performance and conducts academic disciplinary hearings.
Dr. Donald Matz, chair of the APC, repeatedly warned Slaughter regarding her subpar academic performance, sending her letters on August 25, September 9 and 19, and October 10 and 15. Dr. Matz specifically warned Slaughter that she was in jeopardy of failing one or more of her courses. In each letter, Dr. Matz encouraged Slaughter to seek assistance from her course director, faculty advisor, the Center for Academic Success and Enrichment (CASE), and DMU's student counseling center.
On September 3, Slaughter completed a client intake form at the student counseling center. Slaughter indicated she was seeking help for "high anxiety and trouble falling asleep." During her intake appointment, Slaughter signed a document titled "Client Rights, Responsibilities, and Informed Consent." One of the client rights was "[t]o know that personal information cannot be disclosed to anyone, except for professional consultation or supervision, without your specific, written permission." Slaughter underwent weekly counseling sessions with Dr. Emily Sanders, a staff psychologist employed by DMU, from September 9 until June 2015. During these sessions, Slaughter discussed her history of depression and anxiety and often reported feeling worried and depressed because of her bad performance on tests. Slaughter did not give Dr. Sanders permission to discuss her case with DMU's faculty or administrators.
Meanwhile, on September 10, Slaughter completed an intake form at CASE indicating she "would like to find a study strategy that works best for [her]." She did not disclose her depression on the intake *797 form. CASE provided Slaughter with time management strategies, electronic study resources, and one-on-one tutoring. Slaughter claims she talked to someone at CASE about the depressive symptoms she was experiencing and how those symptoms affected her academics, though she could not remember the person's name. Slaughter also claims she discussed her depression with a student tutor from CASE.
On September 20, Slaughter emailed her faculty advisor, Shelley Oren, about her unsuccessful performance on the second biochemistry test. Slaughter and Oren continued to communicate, both in person and by email, throughout the semester. Slaughter did not disclose her depression to Oren.
On September 26, Dr. Matz met with Slaughter to discuss her poor performance in Gross Anatomy and Clinical Medicine. He gave Slaughter tips for labeling anatomical drawings to help her study for class. During this meeting, Dr. Matz encouraged Slaughter to utilize resources available at CASE.
At the end of the fall semester, Slaughter failed her biochemistry course and performed badly in Gross Anatomy and Clinical Medicine. On December 16, Slaughter met with the APC to discuss ways to improve her academic performance and to discuss her academic status. During this meeting, Slaughter was asked to describe her study habits. Slaughter indicated she preferred to watch lectures online instead of attending class in person. Slaughter stated she studied six to eight hours per day, but she was an English undergraduate major and was uncomfortable taking multiple-choice tests. Slaughter did not tell the APC that she was experiencing depression. She stated that she was sick before her first biochemistry examination and that she had trouble sleeping the night before tests. During this meeting, Slaughter was told about the Extended Pathways to Success Program, a program that allows students who are struggling with DMU's traditional four-year program to take fewer courses each semester and complete their coursework in five years.
The following day, Slaughter met with Oren to discuss the APC meeting and the Extended Pathways Program in more detail. During this meeting, Slaughter disclosed for the first time that she was experiencing depression and did not believe she could handle a fifth year of medical school. Slaughter and Oren dispute whether Slaughter had described her symptoms, such as difficulty falling asleep and nervousness, to Oren earlier in the semester. Slaughter declined Oren's request for permission to speak directly with Dr. Matz. Instead, Slaughter promptly that day emailed Dr. Matz disclosing her depression, stating,
[A]t the beginning of the semester I had some personal difficulties that I didn't entirely feel comfortable sharing in such a large setting. I have struggled with depression for a very long time, and at the beginning of the semester I had a horrible relapse of sorts. My normally well controlled disorder ended up severely affecting my life in ways it hasn't in many years. I was barely making it through the day without breaking down, and all the emotional energy it took for me to save face at school was so exhausting that by the time I would get home I had difficulty focusing on my coursework. I was extremely demoralized because of doing poorly it just ended up as this vicious cycle. There would be days where I couldn't get anything done and then I would get really behind, then crammed right before the test, do poorly, and then go right back into depression. I started seeing a therapist when I was about half of the way *798 through biochem and as I have been working with her my mood has improved, making it easier for me to focus on school.
Slaughter also expressed her preference not to enter the Extended Pathways to Success Program:
My fear is that stretching [the program] out in a longer period of time would be extremely detrimental for my mental health, I know I can handle this type of environment for another 3 semesters, but adding on a whole year would be devastating and I fear greatly that I would end up being severely depressed. I really want you to know that my resistance of going to the 5 year plan isn't out of stubbornness or pride, but out of self-preservation. I truly believe that this option would not be beneficial to me at all and instead would be harmful, because my issue is finding the tools that work best for me and getting my depression under control, which would be hindered.
Dr. Matz responded to Slaughter's email within fifteen minutes, stating that he appreciated her sharing that information and that the APC "want[ed her] to succeed." Dr. Matz did not share Slaughter's email or any information about Slaughter's depression with the APC.
On December 18, Dr. Matz wrote to Slaughter to inform her that the APC had decided to place her on academic probation. As a standard term of that probation, Slaughter was required to withdraw from her elective courses for the next semester so she could focus on her core classes. Dr. Matz again encouraged Slaughter to use the student counseling center and CASE, attend all classes, and enter the Extended Pathways to Success Program.
On January 7, 2015, Slaughter met with Dr. Craig Canby, the Associate Dean for Academic Curriculum and Medical Programs, to discuss DMU's policies with regard to academic probation and academic dismissal and to develop an action plan for the upcoming semester. The action plan consisted of study strategies designed to help Slaughter learn course material. Dr. Canby was unaware of Slaughter's depression. Dr. Canby later stated that had he known, "[i]t would have changed the nature of [the] conversation," and he likely would have advised her to seek an accommodation or to take a medical leave of absence.
Also in early January, Oren contacted Slaughter to see whether she would like to talk more about the Extended Pathways Program. Slaughter responded that she was "doing fine" and was "still planning on sticking with the 4 year plan." Oren met with Slaughter one-on-one several times during the second semester to discuss her progress, including meetings on January 7 and 30 and April 10. Oren told Slaughter that she could contact her at any time with questions.
Slaughter continued to struggle academically throughout the second semester, although she ultimately passed the biochemistry course that she had failed first semester. Slaughter met with Dr. Matz in February to discuss her poor performance in her required physiology course. Dr. Matz explained the consequences of failing two courses in the first year, including possible dismissal from DMU.
Slaughter failed physiology and performed poorly in other second semester courses. She ended the second semester with a GPA of 1.88, lower than her first semester GPA of 2.53. Under DMU policy, Slaughter was required to appear before the APC for a dismissal hearing for failing two of her required first-year courses. Slaughter attended the dismissal hearing with the APC on June 30. At Slaughter's *799 request, Dr. Sanders appeared as her advisor. Slaughter discussed her academic performance as well as her use of the DMU resources. She expressed her preference to retake physiology over the summer instead of entering the Extended Pathways Program. Slaughter told the APC that she believed most of her struggles were due to her depression. Regardless, she argued there was an upward trend with her individual physiology test grades.
On July 7, Slaughter was notified that the APC had voted to dismiss her from DMU due to her failing two required first-year courses and her lack of academic professional promise. Slaughter appealed the APC decision. On appeal, DMU concluded the APC complied with DMU's policies and due process and affirmed Slaughter's dismissal.
Slaughter filed a complaint with the Iowa Civil Rights Commission, alleging disability discrimination in violation of the Iowa Civil Rights Act (ICRA). After obtaining a right-to-sue letter, she filed this three-count lawsuit under the ICRA against DMU, alleging discrimination, failure to accommodate, and retaliation based on her mental disability.
After conducting discovery, DMU moved for summary judgment on all counts. DMU's motion stated, "The undisputed material facts demonstrate that DMU reasonably accommodated Slaughter throughout her enrollment at DMU. Accordingly, Slaughter cannot prove her failure to accommodate claim." DMU noted in its statement of undisputed facts,
The sole accommodations that Slaughter claims she proposed to DMU, but did not receive, are 1) the ability to watch classes online, in lieu of attending them in person, and 2) the ability to take electives while on academic probation.
DMU supported its motion with sworn testimony (deposition excerpts and affidavits). Slaughter resisted and filed a cross-motion for partial summary judgment on her accommodation claim. She denied that the accommodations DMU identified were the sole accommodations she sought, but she did not identify what other accommodations she requested. In DMU's reply to Slaughter's resistance, it noted, "Slaughter has pointed to no evidence that she requested a reasonable accommodation that would have enabled her to meet the essential eligibility requirement of passing her required first-year courses." DMU continued,
Slaughter has pointed to no evidence that she could have been reasonably accommodated, but for DMU's alleged lack of good faith .... Instead, Slaughter states that "we will never know" whether she could have performed with reasonable accommodations. Such speculation is not sufficient to survive summary judgment.
Slaughter also filed a "motion to determine admissibility [of evidence,]" which sought a ruling that imputed Dr. Sanders's knowledge of Slaughter's depression to DMU. Slaughter argued that because Dr. Sanders is employed by DMU, her knowledge of Slaughter's depression should be imputed to the University as of September 2014 when their counseling sessions began-about three months before Slaughter first disclosed her depression to the academic decision-makers. DMU resisted.
The district court determined that the psychotherapist-patient privilege applied to the communications between Slaughter and Dr. Sanders and that Slaughter had not waived the privilege. The district court concluded, "To the extent Dr. Sanders has knowledge of [Slaughter's] mental health condition pursuant to her role as a treatment provider, that knowledge cannot be imputed to DMU in its role as an academic institution." The district court also noted *800 provisions in Iowa Code chapter 228 (2014) mandated confidentiality of mental health information. For those reasons, the district court denied Slaughter's evidentiary motion.
At the hearing on the motions, Slaughter abandoned her discrimination claim (count I) and retaliation claim (count III). The district court granted summary judgment in favor of DMU dismissing those claims, and Slaughter does not appeal those rulings. With regard to Slaughter's failure-to-accommodate claim (count II), the district court concluded that DMU became aware of Slaughter's mental disability on December 17, 2014, when she informed Oren and Dr. Matz of her depression. The district court rejected Slaughter's claim that DMU failed to engage in good faith in an interactive process to accommodate her depression.
From the fall of 2014 until the time she was dismissed in the spring of 2015, DMU officials consistently communicated with plaintiff and sought methods to help her improve her academic performance. There was no breakdown in communications. Even viewed in the light most favorable to plaintiff, a reasonable fact finder could not find that DMU failed to act in good faith when engaging in an interactive process to accommodate plaintiff and assist her in satisfying DMU's academic standards despite her depression.
The court also rejected Slaughter's argument that a reasonable accommodation "would have been discovered but for DMU's bad faith." The district court noted Slaughter "offers no evidence that DMU denied any reasonable accommodation she suggested" and that she explicitly conceded "there is no way of knowing whether she could have been successful in meeting DMU's academic standards had she been accommodated differently." The district court entered summary judgment dismissing count II, stating,
On this record, plaintiff has not suggested any accommodations which would have enabled her to pass her classes. Even viewed in the light most favorable to plaintiff, no reasonable factfinder could find that but for DMU's bad faith, plaintiff could have satisfied DMU's academic standards with a reasonable accommodation.
Slaughter appealed, and we retained her appeal.
II. Standard of Review.
We review rulings on the admissibility of allegedly privileged communications for abuse of discretion. State v. Anderson , 636 N.W.2d 26, 30 (Iowa 2001). We review rulings interpreting a statutory privilege for correction of errors at law. Id. ; Fagen v. Grand View Univ. , 861 N.W.2d 825, 829 (Iowa 2015).
"We review summary judgment rulings for correction of errors at law." Deeds v. City of Marion , 914 N.W.2d 330, 339 (Iowa 2018). "Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law." Id. (quoting Goodpaster v. Schwan's Home Serv., Inc. , 849 N.W.2d 1, 6 (Iowa 2014) ). "We view the record in the light most favorable to the nonmoving party." Id.
III. Analysis.
We first address whether the district court erred in denying Slaughter's motion for an evidentiary ruling imputing her psychotherapist's knowledge of her mental disability to DMU's academic decision-makers. We conclude the district court correctly applied the statutory confidentiality requirements for mental health treatment in Iowa Code chapter 228 to deny Slaughter's motion. We next address *801 whether the district court erred in granting DMU's motion for summary judgment on Slaughter's failure-to-accommodate claim. We conclude the district court correctly granted summary judgment for DMU based on the undisputed facts. Slaughter is unable to identify any reasonable accommodation she requested that DMU refused. She cannot show that a reasonable accommodation existed that would have allowed her to meet DMU's academic standards.
A. Slaughter's Motion to Impute Her Psychotherapist's Confidential Knowledge to DMU. It is undisputed that Dr. Sanders was employed by DMU as a staff psychologist in DMU's student counseling center when she treated Slaughter for depression beginning in September 2014. Slaughter argues that Dr. Sanders's knowledge of her depression learned while treating her must be imputed to DMU under principles of agency law.[1] See John Q. Hammons Hotels, Inc. v. Acorn Window Sys., Inc. , 394 F.3d 607, 611 (8th Cir. 2005) ("It has long been held in Iowa that where information is imparted to an employee, acting within the scope of his employment, the knowledge of the employee is imputed to the employer under principles of agency law."). The district court rejected that argument, ruling that this general principle of agency law yields to the psychotherapist-patient privilege and statutory confidentiality for mental health treatment notwithstanding Dr. Sanders's status as an employee of DMU. This is a question of first impression in Iowa.[2]
We begin by addressing the scope of the statutory restrictions on sharing mental health treatment information. We then address whether the statutory nondisclosure requirements trump the general principle of agency law imputing an employee's knowledge to the employer.
1. Statutory prohibitions on disclosure of mental health information. The district court relied on two Iowa statutes protecting the privacy of mental health information: Iowa Code sections 622.10 and 228.2. We will address each in turn. Section 622.10 codifies the psychotherapist-patient privilege for evidentiary purposes and provides,
A ... mental health professional, ... who obtains information by reason of the person's employment ... shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline.
Iowa Code § 622.10(1). The term "mental health professional" includes psychologists licensed under Iowa Code chapter 154B. Id. § 622.10(7). The parties agree that Dr. Sanders is a mental health professional within the meaning of section 622.10. "The privilege [of Iowa Code section 622.10 ] extends to *802 medical records that contain information which would be inadmissible at trial as oral testimony from the physician." State v. Eldrenkamp , 541 N.W.2d 877, 881 (Iowa 1995). The testimonial privilege in section 622.10 also limits discovery into physician-patient communications. Chung v. Legacy Corp. , 548 N.W.2d 147, 151 (Iowa 1996).
The purpose of the psychotherapist-patient "privilege is 'to promote free and full communication between a patient and his doctor so that the doctor will have the information necessary to competently diagnose and treat the patient.' " Fagen , 861 N.W.2d at 831-32 (quoting State v. Heemstra , 721 N.W.2d 549, 560-61 (Iowa 2006) ). We construe section 622.10 liberally to carry out this purpose. Id. "We have repeatedly emphasized 'the importance of maintaining confidentiality in mental health treatment.' " In re A.M. , 856 N.W.2d 365, 377 (Iowa 2014) (quoting State v. Thompson , 836 N.W.2d 470, 483 (Iowa 2013) ). Indeed, "[t]he American Psychiatric Association has recognized that confidentiality is essential to effective treatment." Id. "[A] right as valuable as a psychotherapist privilege should not be deemed to be waived by implication except under the clearest of circumstances." Heemstra , 721 N.W.2d at 560.
The district court ruled that Iowa Code section 622.10 applies to preclude imputing Dr. Sanders's knowledge gained treating Slaughter to DMU. We reach a different conclusion. "The physician-patient rule provided in section 622.10 is an evidentiary rule rather than a substantive right." Roosevelt Hotel Ltd. P'ship v. Sweeney , 394 N.W.2d 353, 355 (Iowa 1986). We have not applied Iowa Code section 622.10 outside of litigation to mandate confidentiality of physician-patient communications. See id. (noting "the medical profession's self-imposed standard of conduct, originating in the Hippocratic oath, that a physician not disclose a patient's confidences without the patient's consent, except as authorized or required by law"). Accordingly, we do not rely on Iowa Code section 622.10 here.
The district court, however, properly relied on Iowa Code section 228.2, which more broadly restricts disclosure of mental health information.
Except as specifically authorized in [sections not relevant here], a mental health professional, data collector, or employee or agent of a mental health professional, of a data collector, or of or for a mental health facility shall not disclose or permit the disclosure of mental health information.
Iowa Code § 228.2(1). Chapter 228 permits certain limited disclosures. For example, a patient eighteen years or older may consent to the disclosure of mental health information. Id. § 228.3(1). Slaughter, however, did not give Dr. Sanders consent to divulge Slaughter's depression to DMU's academic decision-makers.
Slaughter instead relies on another exception stating, "Mental health information relating to an individual may be disclosed to other providers of professional services or their employees or agents if and to the extent necessary to facilitate the provision of administrative and professional services to the individual." Id. § 228.5(4). Slaughter argues that section 228.5(4) required Dr. Sanders to disclose Slaughter's name and diagnosis to DMU's accommodation specialists so they could provide Slaughter with services.
The district court correctly found this disclosure provision to be inapplicable. "Professional services" are defined to "mean[ ] diagnostic or treatment services for a mental or emotional condition provided by a mental health professional." Id. § 228.1(8). DMU's academic accommodation specialists are not mental health professionals *803 who would diagnose or treat Slaughter's anxiety and depression. "Administrative information" relates to billing information but does not include the patient's diagnosis. Id. § 228.1(1). Section 228.5(4) would not allow Dr. Sanders to disclose Slaughter's depression to DMU's academic decision-makers. In addition, the Federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) mandates confidentiality of mental health treatment. See generally Pub. L. No. 104-191, 110 Stat. 1936 (codified in scattered sections of 18, 26, 29, and 42 U.S.C.); Harrold-Jones v. Drury , 422 P.3d 568, 570-77 (Alaska 2018) (noting "cultural shift emphasizing medical privacy" and reviewing HIPAA requirements and interplay with state law); In re A.M. , 856 N.W.2d at 379-80 (reviewing HIPAA privacy regulations); 45 C.F.R. pts. 160, 164 (2014) (HIPAA privacy regulations).
The district court correctly concluded that Dr. Sanders was prohibited from divulging Slaughter's mental health information to DMU without a waiver from Slaughter, which she had not provided. Indeed, other courts have recognized a psychotherapist's tort liability for unauthorized disclosure of a patient's confidential information. See, e.g. , Gracey v. Eaker , 837 So.2d 348, 353, 357 (Fla. 2002). The statutory protections against disclosure of mental health information do not depend on who pays the therapist's salary. The same confidentiality applies whether the therapist is in private practice or a university employee. A contrary holding would have a chilling effect on the willingness of students to open up to psychotherapists employed by their university.
2. Exceptions to agency law principles generally imputing an employee's knowledge to the employer. Slaughter nevertheless argues that under principles of agency law, Dr. Sanders's knowledge of Slaughter's disability should be imputed to DMU's academic decision-makers for purposes of determining whether DMU failed to reasonably accommodate her. "Iowa subscribes to the well-settled rule that 'ordinarily knowledge of an agent is imputed to the principal.' " John Q. Hammons Hotels, Inc. , 394 F.3d at 611 (quoting Mechanicsville Tr. & Sav. Bank v. Hawkeye-Sec. Ins. , 158 N.W.2d 89, 91 (Iowa 1968) ). But here, this general rule must yield to an exception for privileged communications.
The Restatement (Third) of Agency provides,
For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent
....
(b) is subject to a duty to another not to disclose the fact to the principal.
Restatement (Third) of Agency § 5.03(b), at 359 (Am. Law Inst. 2006) [hereinafter Restatement (Third) ].
Because Dr. Sanders owes a statutory duty to Slaughter not to disclose the information she learns during her counseling sessions, Dr. Sanders's knowledge of Slaughter's disability cannot be imputed to the academic decision-makers at DMU. See Reinninger v. Prestige Fabricators, Inc. , 136 N.C.App. 255, 523 S.E.2d 720, 725 (1999) (holding that a company physician's knowledge gained from confidential communications with employee-patient could not be imputed to the employer to show that there was improper ex parte communication between the employer and physician); Restatement (Third) § 5.03(b) cmt. e , at 374-75; see also *804 Farnsworth v. Hazelett , 197 Iowa 1367, 1373, 199 N.W. 410, 413 (1924) ("When [the knowledge] has been acquired confidentially as attorney for a former client in a prior transaction, the reason of the rule ceases, and in such a case an agent would not be expected to do that which would involve the betrayal of professional confidence; and his principal ought not to be bound by his agent's secret and confidential information." (alteration in original) (quoting Akers v. Rowan , 33 S.C. 451, 12 S.E. 165, 172 (1890) )).
We hold the disclosure restrictions in Iowa Code chapter 228 and HIPAA fall within this exception to the general principle of agency law imputing an employee's knowledge to the employer. The district court correctly ruled that confidential information Dr. Sanders learned while treating Slaughter is not imputed to DMU. We affirm the ruling denying Slaughter's evidentiary motion.
B. Slaughter's Failure-to-Accommodate Claim. The district court granted DMU's motion for summary judgment dismissing Slaughter's claim the medical school failed to accommodate her mental disability. Slaughter argues questions of fact precluded summary judgment. DMU argues summary judgment was correctly granted based on the undisputed facts. We begin by reviewing the governing law. We then determine whether the district court correctly applied the law to this factual record.
1. Failure-to-accommodate claims in higher education. Slaughter brought her action under the ICRA. The ICRA "shall be construed broadly to effectuate its purposes." Iowa Code § 216.18(1). "It is an unfair or discriminatory practice for any educational institution to discriminate on the basis of ... disability in any program or activity." Id. § 216.9(1). In Palmer College of Chiropractic v. Davenport Civil Rights Commission , we reviewed disability claims against a chiropractic school. 850 N.W.2d 326, 328-29 (Iowa 2014). We looked to cases interpreting the Americans with Disabilities Act (ADA) and the Rehabilitation Act as well as employment discrimination cases for guidance analyzing disability discrimination claims brought under the ICRA against a graduate school. Id. at 333-34. We acknowledged courts owe "some deference to the institution's professional or academic judgment" in determining its obligation to reasonably accommodate a student's disability. Id. at 337. But we concluded the educational institution
has a "real obligation" to seek out "suitable means of reasonably accommodating" individuals with disabilities and to submit "a factual record indicating" it "conscientiously carried out this statutory obligation." That obligation requires an individualized and extensive inquiry-an institution must "carefully consider[ ] each disabled student's particular limitations and analyz[e] whether and how it might accommodate that student in a way that would allow the student to complete the school's program without lowering academic standards."
Id. (alterations in original) (citation omitted) (first quoting Wynne v. Tufts Univ. Sch. of Med. , 932 F.2d 19, 25-26 (1st Cir. 1991) ; then quoting Wong v. Regents of Univ. of Cal. , 192 F.3d 807, 826 (9th Cir. 1999) ).
Judicial deference to the institution is especially appropriate for purely academic requirements. See Regents of Univ. of Mich. v. Ewing , 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) ("When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate *805 that the person or committee responsible did not actually exercise professional judgment." (Footnote omitted.)); see also Palmer , 850 N.W.2d at 339 (applying Ewing to evaluate requested accommodation to technical standards in chiropractic program).
The student asserting a failure-to-accommodate claim must show that (1) she is disabled, (2) the defendant had notice of her disability, (3) she is an "otherwise qualified" student either with or without a reasonable accommodation, and (4) the defendant failed to provide reasonable accommodations. Mershon v. St. Louis Univ. , 442 F.3d 1069, 1076-77 (8th Cir. 2006) ; see also Palmer , 850 N.W.2d at 334. "A ... disabled person is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." Kaltenberger v. Ohio Coll. of Podiatric Med. , 162 F.3d 432, 435 (6th Cir. 1998).[3]
The student "bears the initial burden of demonstrating that he requested reasonable accommodations ... and that those accommodations would render him otherwise qualified" to meet the educational institution's essential eligibility requirements. Mershon , 442 F.3d at 1077. As we have said in the employment context, "the plaintiff must produce enough evidence to make a facial showing that reasonable accommodation is possible." Boelman v. Manson State Bank , 522 N.W.2d 73, 80 (Iowa 1994). "This showing is not an onerous one and requires no more of the employee than to propose an accommodation and present testimony of its feasibility." Goodpaster , 849 N.W.2d at 17 ; see also Miceli v. JetBlue Airways Corp. , 914 F.3d 73, 83 (1st Cir. 2019) (affirming summary judgment for employer and stating the employee's request for accommodation for her depression and PTSD "must comprise more than a cryptic communication to be deciphered by the recipient" and "[i]mportantly, such a request must illuminate the linkage between the requestor's disability and the requested accommodation").
An accommodation is unreasonable "if it requires 'a fundamental alteration' " to the academic program. Palmer , 850 N.W.2d at 336 (quoting Se. Cmty. Coll. v. Davis , 442 U.S. 397, 410-12, 99 S.Ct. 2361, 2369-70, 60 L.Ed.2d 980 (1979) ). "It is beyond question that it would fundamentally alter the nature of a graduate program to require the admission of a disabled student who cannot, with reasonable accommodations, otherwise meet the academic standards of the program." Mershon , 442 F.3d at 1076.
The student's request for accommodations triggers the interactive process. Id. at 1077 ; see also Zukle v. Regents of the Univ. of Cal. , 166 F.3d 1041, 1046-47 (9th Cir. 1999). In the employment context,
[t]o show that an employer failed to participate in the interactive process, an employee must show that: (1) the employer knew of the employee's disability; (2) the employee requested accommodations or assistance; (3) the employer did not in good faith assist the employee in seeking accommodations; and (4) the *806 employee could have been reasonably accommodated but for the employer's lack of good faith.
Kallail v. Alliant Energy Corp. Servs., Inc. , 691 F.3d 925, 933 (8th Cir. 2012). The parties agree we should use this standard in the educational context when evaluating failure-to-accommodate claims under the ICRA.
2. DMU's actions in attempting to accommodate Slaughter. DMU agrees that Slaughter is disabled within the meaning of the ICRA, that DMU had notice of her mental disability, and that the interactive process was triggered by Slaughter's email of December 17, 2014. The parties agree that without an accommodation, Slaughter was not a qualified individual for DMU's medical degree program. It is undisputed that she failed two required courses and performed poorly in other courses her first year. Her second semester GPA declined to 1.88 from a first semester GPA of 2.53, lowering her cumulative GPA to 2.19. Her poor performance provided grounds for her expulsion under DMU's academic standards. She does not appeal the district court's summary judgment dismissing her disability discrimination and retaliation claims. The sole issue is whether the district court erred by granting summary judgment on her failure-to-accommodate claim.
The district court relied on undisputed facts. DMU offered Slaughter the Extended Pathways to Success Program, extending the medical school program a fifth year, which she refused. DMU provided her weekly psychotherapy at no cost and one-on-one tutoring throughout her first year, as well as regular consultations with her faculty advisor and Dr. Matz, the chair of the APC. She still failed to meet the academic requirements. At Slaughter's request, DMU permitted her to monitor lectures online instead of sitting in the classroom. She asked for permission to continue taking elective courses while on academic probation, which DMU refused. DMU's policy is to defer elective courses to enable the student struggling on academic probation to concentrate on required courses. We defer to DMU's academic judgment. See Ewing , 474 U.S. at 225, 106 S.Ct. at 513 ; see also Shaikh v. Lincoln Mem'l Univ. , 608 F. App'x 349, 355 (6th Cir. 2015) (holding as a matter of law that a medical student's request for a decelerated five-year rather than a four-year curriculum was not a reasonable accommodation). Slaughter never explained how increasing her workload with electives would have helped her pass the core courses. She never asked for an academic withdrawal or medical leave. She never asked for additional time during examinations. She never asked for additional tutoring, academic counseling, or psychotherapy beyond that already provided to her. She never asked for any additional physical assistance. She was denied no request for equipment or technical support.
DMU interacted extensively with Slaughter to help her meet its academic standards before and after she disclosed her depression. We decline to disregard DMU's efforts to accommodate Slaughter's academic struggles that preceded her disclosure. She attributes her academic struggles to her depression, and the extra assistance DMU provided her was to assist her academic performance. The district court correctly concluded,
Arguably, DMU's actions were not specifically directed at accommodating plaintiff's claimed disability of depression. However, DMU consistently worked with plaintiff and offered options and resources to help her succeed as a student, and it is immaterial whether those actions are characterized as efforts to accommodate her disability or *807 efforts to improve her academic performance. The fact that DMU offered the same types of services and resources to other students who do not have disabilities cannot be held against the university. What counts is whether DMU engaged in a process with plaintiff that would allow the parties to discover reasonable accommodations that would allow plaintiff to succeed with her coursework.
(Citation omitted.) Similarly, in Halpern v. Wake Forest University Health Sciences , the United States Court of Appeals for the Fourth Circuit weighed a medical school's efforts to assist a struggling student before and after he disclosed his anxiety disorder and attention deficit /hyperactivity disorder (ADHD). 669 F.3d 454, 466 (4th Cir. 2012). The Fourth Circuit affirmed summary judgment, dismissing a failure-to-accommodate mental disability claim based on the school's "significant efforts throughout the period of Halpern's enrollment to help him satisfy its academic and professional standards." Id. That court saw no reason to disregard assistance provided before the plaintiff disclosed his mental diagnosis, nor do we. In any event, the psychotherapy provided by Dr. Sanders throughout the year was specifically treating Slaughter's depression.
We agree with the district court that Slaughter has failed to identify any reasonable accommodation she requested that DMU refused. She named no such requested accommodation in resisting summary judgment, in her appellate briefs, or in her counsel's oral argument in this appeal.
This case is unlike Dean v. University at Buffalo School of Medicine & Biomedical Sciences , in which the medical student suffering from depression actually "requested a three-month leave to seek medical treatment and study" for a required examination. 804 F.3d 178, 190-91 (2d Cir. 2015). The school denied his request. Id. at 191. The district court granted summary judgment dismissing his ADA failure-to-accommodate claim. Id. at 182. The appellate court reversed, concluding the student met his initial burden resisting summary judgment by showing the existence of an accommodation he requested that would allow him to meet the essential requirements of the program and that a jury could find the abbreviated study time offered by the school would be ineffective. Id. at 190-91. The Dean court noted the plaintiff "offered evidence to establish that he was not treated in an evenhanded manner with respect to similarly situated students." Id. at 189.
By contrast, Slaughter never asked DMU for medical leave and offered no evidence that similarly situated students were treated more favorably. Apart from what she requested while a student at DMU, Slaughter subsequently failed to identify any possible accommodation she claims could have enabled her to meet DMU's academic standards. Slaughter and her counsel, prior to summary judgment, were well aware of Dr. Canby's testimony that he would have considered offering her a medical leave. Nevertheless, Slaughter from the inception of this lawsuit through oral argument and resolution of this appeal never mentioned medical leave as a possible accommodation she would have accepted. She made no claim for medical leave in her district court resistance to summary judgment or at any point in this appeal. It is not the court's role to propose medical leave on her behalf.[4]
*808 We decline to speculate that continued interaction would have revealed a reasonable accommodation that Slaughter and her counsel had yet to discover. See Hlubek v. Pelecky , 701 N.W.2d 93, 96 (Iowa 2005) ("Speculation is not sufficient to generate a genuine issue of fact."). We are applying the plain meaning of our rule of civil procedure governing summary judgment, which provides,
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials in the pleadings, but the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered.
Iowa R. Civ. P. 1.981(5). As we have long emphasized,
The resistance must set forth specific facts which constitute competent evidence showing a prima facie claim. By requiring the resister to go beyond generalities, the basic purpose of summary judgment procedure is achieved: to weed out "[p]aper cases and defenses" in order "to make way for litigation which does have something to it."
Thompson v. City of Des Moines , 564 N.W.2d 839, 841 (Iowa 1997) (alteration in original) (quoting Fogel v. Trs. of Iowa Coll. , 446 N.W.2d 451, 454 (Iowa 1989) ).
Summary judgment is not a dress rehearsal or practice run; "it is the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events."
Hammel v. Eau Galle Cheese Factory , 407 F.3d 852, 859 (7th Cir. 2005) (quoting Schacht v. Wis. Dep't of Corr. , 175 F.3d 497, 504 (7th Cir. 1999), overruled on other grounds as stated in Higgins v. Mississippi , 217 F.3d 951, 954 (7th Cir. 2000) ; see also Drainage Dist. No. 119 v. Incorporated City of Spencer , 268 N.W.2d 493, 499 (Iowa 1978) ("The purpose of summary judgment is to enable a judgment to be obtained promptly and without the expense of a trial when there is no genuine and material fact issue present."); Bauer v. Stern Fin. Co. , 169 N.W.2d 850, 853 (Iowa 1969) ("The purpose of all summary judgment rules is to avoid useless trials.... [A] party may not 'rest upon the mere allegations or denials of his pleading.' He must set forth specific facts showing there is a genuine issue. He cannot merely say there is one; but it must appear 'by affidavits or otherwise' that this is the case."); James v. Swiss Valley AG Serv. , 449 N.W.2d 886, 888 (Iowa Ct. App. 1989) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " (quoting Celotex Corp. v. Catrett , 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) )).
We need not decide whether DMU should have done more to engage in the interactive process with Slaughter.[5] To *809 avoid summary judgment, Slaughter had to make a facial showing that a reasonable accommodation existed that could have enabled her to meet the medical school's academic requirements. She made no such showing. Other courts have affirmed summary judgment dismissing failure-to-accommodate claims when the plaintiff lacked evidence that a reasonable accommodation existed, even if the defendant had failed to engage in an adequate interactive process. See, e.g. , Stern v. St. Anthony's Health Ctr. , 788 F.3d 276, 293 (7th Cir. 2015) ("But regardless of the state of the record, an employer's failure 'to engage in the required [interactive] process ... need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation.' " (alterations in original) (quoting Basden v. Prof'l Transp., Inc. , 714 F.3d 1034, 1039 (7th Cir. 2013) )); EEOC v. Ford Motor Co. , 782 F.3d 753, 766 (6th Cir. 2015) (concluding that if an employee cannot generate a fact question as to whether a reasonable accommodation, the employer will not be liable "[e]ven if [the employer] did not put sufficient effort into the 'interactive process' of finding an accommodation"); Jacobs v. N.C. Admin. Office of the Cts. , 780 F.3d 562, 581 (4th Cir. 2015) ("However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position."); Jones v. Nationwide Life Ins. , 696 F.3d 78, 91 (1st Cir. 2012) (noting "[a]n employer's duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of [his] job with an accommodation[,]" and "[i]t was [the employee's] burden 'to proffer accommodations that were reasonable under the circumstances' " (quoting Jones v. Walgreen Co. , 679 F.3d 9, 19 & n.6 (1st Cir. 2012) )); Hennagir v. Utah Dep't of Corr. , 587 F.3d 1255, 1265 (10th Cir. 2009) ("Even if [an employer] fail[s] to fulfill its interactive obligations to help secure a [reasonable accommodation], [the plaintiff] will not be entitled to recovery unless [s]he can also show that a reasonable accommodation *810 was possible...." (alterations in original) (quoting Smith v. Midland Brake, Inc. , 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc))); McBride v. BIC Consumer Prods. Mfg. Co. , 583 F.3d 92, 101 (2d Cir. 2009) ("The employer's failure to engage in such an interactive process, however, does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible.").[6] But see Snapp v. United Transp. Union , 889 F.3d 1088, 1100 (9th Cir. 2018) (taking minority view by holding at summary judgment stage employer has the burden to show no reasonable accommodation existed), cert. denied , --- U.S. ----, 139 S.Ct. 817, 202 L.Ed.2d 577 (2019).
In Stern v. University of Osteopathic Medicine & Health Sciences , the Eighth Circuit affirmed summary judgment dismissing a medical student's failure-to-accommodate claims under the ICRA and federal law. 220 F.3d 906, 908-09 (8th Cir. 2000). The student notified the medical school that he had dyslexia and requested accommodations on multiple-choice exams to allow him to explain answers by essay or through oral questioning. Id. at 907. The medical school offered different accommodations-someone reading the questions to the student on audiotape, a private room, and additional time for the exams; the student nevertheless failed too many exams to stay enrolled. Id. The district court granted summary judgment on grounds the school reasonably accommodated him as a matter of law. Id. at 907-08. The student appealed, arguing "the medical school had failed to engage in an interactive process with him to determine what accommodations for his disability were reasonable." Id. at 908. The Eighth Circuit affirmed the summary judgment because "Stern did not provide probative evidence [of a reasonable accommodation] that would permit a fact finder to rule in his favor without engaging in speculation." Id. at 909.
Similarly, in Mershon , the Eighth Circuit affirmed summary judgment dismissing ADA failure-to-accommodate claims, notwithstanding a disabled student's evidence the university failed to engage in the interactive process, because the sight-impaired, wheelchair-bound student failed to meet his "initial burden of demonstrating that reasonable accommodations would render him qualified for admission into the graduate school." 442 F.3d at 1078 (noting deference due graduate school's academic judgment). Slaughter's claim fails for the same reason. DMU was entitled to summary judgment on this record based on Slaughter's failure to make a facial showing of any reasonable accommodation that could have enabled her to meet DMU's academic requirements. See id.
This case stands in sharp contrast to Palmer . In Palmer , a blind student requested accommodations to meet technical requirements in a graduate program at a chiropractic school. 850 N.W.2d at 329-30. Palmer's technical requirements included the ability to interpret and make diagnoses based on radiographic images (x-ray films). Id. at 330, 345. The student asked that a "sighted assistant" describe what the images depicted so that the student could then make interpretive diagnoses. Id. at 330. Palmer refused, on grounds that the requested accommodation "would fundamentally alter the institution's educational program." Id. The student filed a complaint with the Davenport Civil Rights Commission. Id. at 331. The commission *811 conducted a two-day evidentiary hearing and issued a final order with extensive findings of fact and conclusions of law that Palmer violated the ICRA and ADA by refusing the requested accommodation. Id. at 332. The commission relied on evidence that Palmer previously graduated blind students from its chiropractic program, that Palmer's California campus had already waived similar vision-specific competency requirements without compromising its accreditation, that many practicing chiropractors outsource the interpretation of radiographic images, and that Palmer failed to present evidence state licensing boards would exclude blind chiropractors. Id. On judicial review, our court affirmed the commission based on those factual findings. Id. at 344-46.
In Palmer , the school violated the ICRA by denying the student's requested accommodation of a sighted assistant to enable him to satisfy course requirements. Id. at 330, 345. By contrast, Slaughter cannot identify any accommodation that she requested and DMU refused that could have enabled her to meet her school's academic requirements. In Palmer , we relied on evidence that other blind students were allowed to graduate. Id. at 331. Slaughter, however, does not claim any other medical students with depression were granted accommodations DMU denied to her.
Medical schools must prepare their students for a demanding profession. See Ohio Civil Rights Comm'n v. Case W. Reserve Univ. , 76 Ohio St.3d 168, 666 N.E.2d 1376, 1387 (Ohio 1996) ("[G]raduates must have the knowledge and skills to function in a broad variety of clinical situations and to render a wide spectrum of patient care."). Graduate schools are not required to lower their academic standards to accommodate a student's disability. Palmer , 850 N.W.2d at 337. Appellate courts reviewing records comparable to Slaughter's have given due deference to the faculty's academic judgment when affirming summary judgments dismissing a medical student's failure-to-accommodate disability claim. See Halpern , 669 F.3d at 463 (collecting cases extending "deference to schools' professional judgments regarding students' qualifications when addressing disability discrimination claims" and according "great respect" to medical school's academic judgment expelling student with ADHD and anxiety); Zukle , 166 F.3d at 1047-48, 1050-51 (noting "a majority of circuits have extended judicial deference to an educational institution's academic decisions" and concluding medical school was not required to keep student with learning disability on a decelerated schedule); Kaltenberger , 162 F.3d at 436 ("Right or wrong, we must defer to this considered academic judgment" expelling student with ADHD who remained unable to pass biochemistry after a variety of accommodations); Wynne v. Tufts Univ. Sch. of Med. , 976 F.2d 791, 795-96 (1st Cir. 1992) (reviewing undisputed facts "in the deferential light that academic decisionmaking deserves" and determining that no "reasonable factfinder could conclude that Tufts, having volunteered such an array of remedial measures, was guilty of failing to make a reasonable accommodation [for dyslexia ] merely because it did not also offer Wynne, unsolicited, an oral rendering of the biochemistry examination"). We accord the same respect to DMU's academic judgment expelling a medical student who failed required courses despite the ongoing academic assistance and psychotherapy provided to her.
As the Ohio Supreme Court concluded, "considerable judicial deference must be paid to academic decisions made by the institution itself unless it is shown that the standards serve no purpose other than to deny an education to the handicapped."
*812 Case W. Reserve Univ. , 666 N.E.2d at 1386. Slaughter made no such showing.
IV. Disposition.
For these reasons, we affirm the district court's denial of Slaughter's motion for evidentiary ruling and affirm the summary judgment in favor of DMU.
AFFIRMED.
All justices concur except Appel, J., Cady, C.J., and Wiggins, J., who dissent.

Slaughter also argues that the knowledge of Oren, her faculty adviser, should be imputed on DMU. However, the record does not show that Slaughter discussed her depression with Oren at any time before the APC meeting on December 16, 2014. Slaughter told Oren about her depression the following day, immediately before Slaughter emailed Dr. Matz disclosing her depression for the first time. Because Oren only knew of Slaughter's disability minutes before Slaughter disclosed it to Dr. Matz, we see no basis for reversal.

In Deeds , we declined to impute a physician's knowledge of a job applicant's disability to the prospective employer, City of Marion, because the record showed the physician (hired by the city to perform preemployment physicals) was an independent contractor, not the city's employee or agent. 914 N.W.2d at 349.

See also Palmer , 850 N.W.2d at 334 (defining "qualified individual" under the Rehabilitation Act as someone "who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity," 34 C.F.R. § 104.3(l )(3) (2013), and defining a "qualified individual with a disability" under the ADA as someone "who, with or without reasonable modifications to rules, policies, or practices ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided," 42 U.S.C. § 12131(2) (2006) ).

It may well be that Slaughter did not want medical leave for the same reasons she expressly declined the offer to enter into the Extended Pathways to Success Program. In any event, "[w]hile allowing a medical leave of absence might, in some circumstances, be a reasonable accommodation, '[a]n employer is not required by the ADA ... to provide an unlimited absentee policy.' " Brannon v. Luco Mop Co. , 521 F.3d 843, 849 (8th Cir. 2008) (citation omitted) (quoting Buckles v. First Data Res., Inc. , 176 F.3d 1098, 1101 (8th Cir. 1999) ; see also id. (affirming summary judgment for employer on grounds that employee "failed to demonstrate that her requested accommodation of additional time off to recuperate would have enabled her to have consistent attendance at work").

This case is factually distinguishable from Taylor v. Phoenixville School District , 184 F.3d 296 (3d Cir. 1999). The plaintiff in Taylor , a secretary to an elementary school principal, had performed her job with exemplary reviews for almost twenty years until she began experiencing the onset of a manic episode while at work. Id. at 302. The plaintiff took a leave of absence and was admitted to a psychiatric hospital where she was diagnosed with bipolar disorder. Id. at 302-03. After approximately three weeks of hospitalization, the plaintiff was discharged with orders to continue taking medication and meeting with a psychiatrist. Id. at 303. The plaintiff returned to work and sought accommodations from her employer. Id. Instead of offering accommodations, her employer increased the difficulty of her job and began documenting her mistakes. Id. at 303-05. The plaintiff was eventually terminated from her position. Id. at 305.
The Taylor court determined that "[a] reasonable jury could conclude that the school district did not engage in an interactive process of seeking accommodations and is responsible for the breakdown in the [interactive] process." Id. at 315. The court concluded, "Given the evidence [the plaintiff] presents of bad faith on the school district's part, we will not decide on summary judgment that it would have been fruitless for the school district to make some modest and fairly obvious efforts to accommodate." Id. at 319 (emphasis added); see also id. (discussing possible reasonable accommodations). The Third Circuit noted, however, that if the jury determined the employer had not caused the breakdown in the interactive process, the plaintiff still "must demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job." Id. at 320.

The court in Snapp v. United Transportation Union set fort the foregoing authorities in its opinion. 889 F.3d 1088, 1099-1100 (9th Cir. 2018 (Meloy, J.), cert. denied , --- U.S. ----, 139 S.Ct. 817, 202 L.Ed.2d 577 (2019).