# IN THE COURT OF APPEALS OF IOWA

No. 18-1294
Filed July 24, 2019

**JOHN L. HINTERMEISTER,**
        Plaintiff-Appellant,

**vs.**

**BELIN McCORMICK, PC, NATHAN J. BARBER, RIVERVIEW HOTEL DEVELOPMENT, LLC, d/b/a MERRILL HOTEL & CONFERENCE CENTER, and MLC LAND COMPANY, LLC,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Muscatine County, Patrick McElyea, Judge.

        Plaintiff appeals the district court decision granting summary judgment to defendants. **AFFIRMED.**


        Patrick L. Woodward and Ryan F. Gerdes (until withdrawal) of McDonald, Woodward & Carlson, P.C., Davenport, for appellant.

        Matthew C. McDermott of Belin McCormick, P.C., Des Moines, for appellee Belin McCormick, P.C.

        Steven J. Havercamp of Stanley, Lande & Hunter, P.C., Davenport, for appellees.


        Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**POTTERFIELD, Presiding Judge.**

Plaintiff John Hintermeister appeals the district court decision granting summary judgment to defendants Nathan Barber, Belin McCormick, P.C., Riverview Hotel Development, LLC, and MLC Land Company, LLC for his claims of tortious interference with business relations and intentional infliction of emotional distress. We determine the district court properly granted the defendants' motion for summary judgment.

## I. Background Facts & Proceedings

This case arises out of a real estate development project pursued by defendants MLC and Riverview. At all times relevant to this dispute, MLC and Riverview were represented by Barber, an attorney at Belin McCormick. In 2016, MLC and Riverview began purchasing parcels of land to develop the Merrill Hotel & Conference Center in downtown Muscatine. One of these parcels, an area of greenspace, was owned by the various condominium owners of the Pearlview Condominium Association (PCA) as tenants in common. Among these tenants were Ronald and Sally Bryant, who owned a three-twentieths fractional interest in the greenspace, and Thomas Meeker, a local businessperson who owned rental property in Muscatine and was president of PCA.

At all times relevant to this dispute, PCA and Meeker individually were represented by plaintiff Hintermeister, an attorney with a part-time law practice at Hintermeister & Kundel. Hintermeister had sold his law practice to Steven Kundel in 2003, and the two attorneys agreed Hintermeister could continue to practice law with Kundel's practice, but only so long as Kundel consented.

In connection with the sale of the greenspace, Barber reviewed the abstract of title and issued a preliminary title opinion on June 2, 2016. The title opinion identified two federal tax liens against the Bryants, which attached to their interest in the greenspace. Barber concluded the tax liens needed to be released in order for his clients to obtain marketable title to the property.

At the same time MLC pursued the greenspace purchase, MLC also sought a construction loan of $20 million from the United States Department of Agriculture (USDA) under Cedar Rapids Bank & Trust (CRBT). The USDA required release of the Bryants' tax liens to satisfy the lender's title opinion.

Hintermeister directly contacted James Howe, a manager of MLC, about closing the greenspace purchase. In a July 27, 2016 email, Hintermeister informed Howe he could not obtain a release for the Bryants' tax liens but informed him

> [i]f closing [the greenspace purchase] soon is critical, I will see if we can arrange to close on the Bryant to Meeker sale, paying the credit union off, paying the closing expenses, and hold the rest of the funds in escrow in my trust account until we can get the tax liens paid and released. We can then immediately close on the Green Space.[1]

On September 15, 2016, MLC closed on the purchase of the greenspace from PCA. Hintermeister had not obtained a release of the Bryants' tax liens at the time of sale. MCL nonetheless agreed to close the deal based on

---

[1] "Bryant to Meeker sale" refers to the purchase of two of the Bryants' other rental parcels by Meeker. The Bryants' tax liens were set to attach to these parcels as well. Meeker had agreed to purchase the parcels from the Bryants, but only if Hintermeister & Kundel held a portion of the purchase price in trust until the Bryants paid the tax liens. Hintermeister entered into an informal agreement with the Bryants' attorney Duane Goedken to determine the amount of the federal tax liens and either have the Bryants pay the liens themselves or use the funds held in trust at Hintermeister & Kundel to pay the liens.

Hintermeister's assurances in the July 27, 2016 email. Barber issued an updated title opinion on December 19, 2016, which noted "John Hintermeister's office is holding funds in escrow for payment of these liens."

The liens had still not been released by March 2017. CRBT contacted Hintermeister on March 9; it had not yet received notification of the release of the Bryants' tax liens and was frustrated Hintermeister had not cooperated in obtaining the release. Hintermeister informed CRBT "I do have the funds in my trust account for the tax liens, and as soon as I have some official notification from the IRS (through Duane Goedken) as to how much will be required to satisfy those liens, I will make payment to the IRS through Duane's office." Hintermeister forwarded this email conversation to Barber.

Hintermeister next updated Barber in an email sent August 9. Hintermeister informed Barber "I think we are finally going to be able to deal with the Ron Bryant tax liens. I have a statement from the IRS, but I want to be sure it covers everything before I release the money." Hintermeister asked Barber to send him a copy of the title opinion showing the tax liens, which Barber provided the same day.

By August 31, CRBT was growing impatient with MLC. USDA was threatening to terminate the $20 million construction loan if the Bryants' tax liens were not released. To avoid termination, CRBT contacted MLC and demanded MLC get the lien release. Barber emailed Hintermeister on August 31 and asked him whether the release had been obtained. Hintermeister replied the same day, saying "I gave the money to Duane Goedken about two weeks ago so he could pay them, but I have not heard anything since."

The communications at the heart of this dispute were sent from Barber and Rebecca Howe (James Howe's wife and an agent for Riverview and MLC) to Hintermeister on September 5. The first communication is a letter from Barber. Citing Hintermeister's statements in his July 27, 2016 email, the March 9, 2017 email chain, and the August 9 email, Barber stated that Hintermeister had agreed to hold the funds in his trust account until the Bryants' tax liens were released and that disbursing the funds without first securing the release violated that agreement:

> The funds were escrowed in your trust account for the purpose of obtaining the lien releases. You informed both [James] Howe and me that you would assume responsibility for obtaining the releases in exchange for the funds.
> This letter is notice that if the tax liens are not released within 20 days of this letter, we will be forced to bring suit for breach of the escrow agreement.

Also on September 5, Rebecca Howe emailed Hintermeister and stated, "Since you are refusing to discuss [releasing the tax liens], I am left with no alternative but to pursue a legal resolution."

Hintermeister responded by sending Belin McCormick and Rebecca Howe his own letter threatening litigation on September 12, and he followed it up with another letter on September 18, reiterating his threat. Hintermeister claimed he would be unable to purchase errors and omissions coverage because of the threats of litigation, which would force him out of his firm. On September 19, 2017, Barber searched the Muscatine County record and discovered that the Bryants' tax liens had been released on September 18. Barber emailed Hintermeister and CRBT and informed them the tax lien matter had been resolved.

Hintermeister brought suit against the defendants on February 22, 2018. In his complaint, Hintermeister alleged that the defendants had interfered with his employment prospects by threatening to sue him in the September 5, 2017 letter. Under Hintermeister & Kundel's firm policy, Hintermeister had been required to report the threat of litigation made in the letter to the firm's errors and omissions liability insurance provider. Kundel terminated Hintermeister's partnership with Hintermeister & Kundel effective December 31, 2018. Hintermeister also sued the defendants for intentional infliction of emotional distress.

Barber and Belin McCormick moved for summary judgment on April 26, 2018. MLC and Riverview joined the motion. The district court granted summary judgment on behalf of all the defendants on July 24, 2018. The court ruled that the defendants' statements fell under the litigation privilege and were therefore immune from civil liability. Hintermeister appealed.

## II. Scope of Review

We review the district court's decision on a motion for summary judgment for correction of errors at law. *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 800 (Iowa 2019); *see also* Iowa R. App. P. 6.907. "Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law." *Id.* (quoting *Deeds v. City of Marion*, 914 N.W.2d 330, 339 (Iowa 2018)). "[W]e review the facts in the light most favorable to the nonmoving party." *Morris v. Steffes Group, Inc.*, 924 N.W.2d 491, 493 (Iowa 2019). "The burden is on the moving party to demonstrate that it is entitled to judgment as a matter of law."

*Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014) (quoting *Sallee v. Stewart*, 613 N.W.2d 128, 133 (Iowa 2013)).

### III. Discussion

The parties argue over application of the "litigation privilege" to the statements made by Barber in his September 5 letter and by Rebecca Howe in her September 5 email to Hintermeister. Hintermeister argues the privilege does not apply because the statements "were not made preliminary to or during any legal proceeding." The defendants argue the privilege is broad enough to cover the statements and bar Hintermeister's suit. We conclude it is.

In the context of a defamation suit, the Iowa Supreme Court has adopted a two-part analysis for determining whether an attorney's communication is protected by the privilege:

> First, the communication must be examined in the context of the occasion to determine if it was made "preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding." Second, the content of the communication must be evaluated to determine if it "has some relation to the proceeding."

*Kennedy v. Zimmerman*, 601 N.W.2d 61, 64 (Iowa 1999) (citations omitted) (quoting Restatement (Second) of Torts § 586 (Am. Law Inst. 1977)). The privilege extends to parties to judicial proceedings as well. *Spencer v. Spencer*, 479 N.W.2d 293, 295 (Iowa 1991) (applying Restatement (Second) of Torts §§ 586–88); *Robinson v. Home Fire & Marine Ins. Co.*, 49 N.W.2d 521, 527 (Iowa 1953) ("The protection which is afforded an attorney under a plea of privilege equally applies to the client he represents."); Restatement (Second) of Torts § 587 ("A party to a private litigation . . . is absolutely privileged to publish

defamatory matter concerning another in communications preliminary to a proposed judicial proceeding . . . if the matter has some relation to the proceeding."). The litigation privilege "encourage[s] the open resolution of disputes by removing the cloud of later civil suits from statements made in judicial proceedings." *Spencer*, 479 N.W.2d at 295. It is "based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." Restatement (Second) of Torts § 586, cmt. a.

We must first determine whether the litigation privilege applies to Hintermeister's claims, even though his claims are for something other than defamation. The district court determined the privilege applied to non-defamation causes of action because "extending the litigation privilege in this case would further its purpose." While the Iowa Supreme Court has not addressed whether the absolute privilege applies outside defamation actions, other courts have concluded it does. *See Simms v. Seaman*, 69 A.3d 880, 905 (Conn. 2013) (discussing the litigation privilege and collecting cases from other jurisdictions expanding the privilege beyond defamation); *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So.2d 380, 384 (Fla. 2007) (extending the litigation privilege to cover all causes of action arising under Florida law); *see also Thornton v. Rhoden*, 53 Cal. Rptr. 706, 719 (Cal. Ct. App. 1966) ("The salutary purpose of the privilege should not be frustrated by putting a new label on the complaint."); Douglas R. Richmond, *The Lawyer's Litigation Privilege*, 31 Am. J. Trial Advoc. 281, 295 (2007) ("It is the perceived necessity for candid and unrestrained communications in those proceedings, free of the threat of legal

actions predicated upon those communications, that is at the heart of the rule. The nature of the underlying dispute simply does not matter." (citing *Echevarria*, 950 So.2d at 385)). We find these authorities persuasive. The policy considerations motivating the application of the privilege to defamation actions support applying the privilege to other causes of actions based on attorney conduct and statements made in the course of client representation. *See* Restatement of Torts § 586 cmt. a. We conclude the litigation privilege can apply to bar Hintermeister's interference with employment prospects and intentional infliction of emotional distress causes of action if the threats of litigation meet both prongs of the test described in *Kennedy*, 601 N.W.2d at 64.

The first prong of the test requires there to be a connection between the statements in question and some judicial proceeding. *See Kennedy*, 601 N.W.2d at 64. Hintermeister argues the letter and email are not sufficiently connected to litigation because the greenspace sale had been finalized for more than a year and Hintermeister was neither a party to nor counsel for any party involved in that transaction. This argument does not accurately characterize the scope of the privilege. The privilege extends beyond statements made in the course of litigation to include pleadings, affidavits, briefs, conferences, and other communications made prior to a proposed judicial proceeding. *See id.* at 65. So long as "the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration," the first prong of the test is met. Restatement (Second) of Torts § 586 cmt. e.

The district court determined the September 5 letter from Barber and email from Rebecca Howe were statements made preliminary to a judicial

proceeding and so satisfied the first prong of the test. We agree. Barber drafted the September 5 letter in connection to his representation of MLC. He had been led to believe Hintermeister could get the liens released based on the July 27, 2016, March 9, 2017, and August 9, 2017 emails. The letter is itself the communication threatening litigation. Similar letters have been considered "preliminary to a proposed judicial proceeding" by other courts. *See, e.g.*, *Messina v. Krakower*, 439 F.3d 755, 761 (D.C. Cir. 2006) (discussing Restatement (Second) of Torts § 586 and concluding a letter threatening litigation was "preliminary to a proposed judicial proceeding" because it "was sent for the very purpose of attempting settlement prior to litigation" (quoting *Messina v. Fontana*, 260 F. Supp. 2d 173, 178 (D.D.C. 2003))); *Atkinson v. Affronti*, 861 N.E.2d 251, 255 (Ill. App. Ct. 2006) ("We are convinced that the same public policy considerations that protect an attorney's statements made to his or her client during the course of a legal proceeding necessarily protect prelitigation communications such as the letter defendant sent to plaintiff's employer."). Similarly, the record shows Rebecca Howe sent the September 5 email from a Riverview email account in her capacity as an agent of Riverview and for the purpose of getting the Bryants' tax liens released. She had also been led to believe Hintermeister could get the tax liens released based on Hintermeister's communications to Barber, MLC and Riverview's attorney. We conclude the September 5 letter from Barber and email from Rebecca Howe were "contemplated in good faith and under serious consideration" of litigation and were made "preliminary to a proposed judicial proceeding" within the meaning the first prong of the test. Restatement (Second) of Torts § 586 cmt. e.

The second prong of the test requires the party asserting the litigation privilege to show a connection between the litigation in question and the communication. *Kennedy*, 601 N.W.2d at 64. The communication "need not be strictly relevant to any issue involved in" the litigation. Restatement (Second) of Torts § 586 cmt. c. We conclude this prong of the test is met for both Barber's letter and Rebecca Howe's email to Hintermeister. The letter is a communication from the counsel (Barber) of a potential plaintiff (MLC and Riverview) to the potential defendant (Hintermeister) regarding the possibility of the plaintiff bringing a lawsuit against the defendant. Rebecca Howe's email from that same day is a communication directly from one party to another for that same purpose. Neither communication discusses any topic besides the tax liens. Both communications have "some relation" to the potential lawsuit under consideration by MLC and Riverview against Hintermeister within the meaning of the litigation privilege test.

Hintermeister argues the litigation privilege is sufficiently narrow to exclude the communications at issue in this case. To support this proposition, he relies on *Spencer*, 479 N.W.2d 293 and *White & Johnson, P.C. v. Bayne*, No. 02-0757, 2003 WL 21696938 (Iowa Ct. App. July 23, 2003), an unpublished decision of a panel of this court. While these opinions caution us to balance the competing interests of zealous advocacy and protecting an individual's reputation, we conclude the communications at issue here nevertheless fall within the scope of the privilege. Both *Spencer* and *Bayne* lean heavily on the fact that the statements at issue were disseminated to third parties with no interest in the litigation. In *Spencer*, the Iowa Supreme Court concluded libelous

letters sent by the defendant were not privileged in part because they "were sent to persons no longer having, or never having, any interest" in the litigation the statements addressed. 479 N.W.2d at 295. Similarly in *Bayne*, a panel of this court upheld the district court's refusal to attach the privilege to a brief that "had some of the markings of a privileged document" but had been disseminated by the defendant to third parties whom the defendant "failed to show . . . had any connection to the litigation." 2003 WL 21696938, at *4. In both cases, the court recognized extending the privilege to communications made to third parties would improperly shield defendants from liability. *Spencer*, 479 N.W.2d at 296 (quoting *Asey v. Hallmark Cards, Inc.*, 594 F.2d 692, 698 (8th Cir. 1979)); *see also Bayne*, 2003 WL 21696938, at *4 (quoting the *Spencer*). Here, neither statement was disseminated to third parties by the defendants. Both communications were sent between Hintermeister, Barber, and the Howes, all of whom had an interest in the litigation.

## IV. Conclusion

We conclude the litigation privilege applies to the September 5 letter sent by Barber and the September 5 email sent by Rebecca Howe. The statements were made in good faith, and the litigation threatened was seriously considered. Defendants' statements are entitled to absolute immunity. The district court did not err in granting Defendants' motion for summary judgment.

**AFFIRMED.**