# IN THE COURT OF APPEALS OF IOWA

No. 22-1908
Filed December 6, 2023

WILLIE HARRIS, Individually, and as Administrator of the ESTATE OF SABRINA HARRIS, and BREANNA HARRIS,
    Plaintiffs-Appellants,

vs.

SELECT SPECIALTY HOSPITAL - QUAD CITIES, INC., SELECT SPECIALTY HOSPITAL - EASTERN IOWA, INC., and SELECT MEDICAL CORPORATION,
    Defendants-Appellees.
_____

    Appeal from the Iowa District Court for Scott County, Tom Reidel, Judge.

    Plaintiffs in a professional negligence case appeal the dismissal of their claims. **AFFIRMED.**

    Andrew Mahoney and Edward J. Prill of Crowley & Prill, Burlington, for appellants.

    Amanda M. Richards and Martha L. Shaff of Betty, Neuman & McMahon, P.L.C., Davenport, for appellees.

    Heard by Schumacher, P.J., Langholz, J., and Gamble, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**GAMBLE, Senior Judge.**

The Estate of Sabrina Harris, Willie Harris (as administrator and individually), and Breanna Harris[1] (collectively "the Harrises") appeal the district court striking one of their expert witnesses and granting summary judgment and dismissing their claims against Select Specialty Hospital–Quad Cities, Inc., Select Specialty Hospital–Eastern Iowa, Inc., and Select Medical Corporation (collectively "Select"). Finding the Harrises failed to establish a prima facie case of medical negligence, we affirm.

### I.      Background Facts and Proceedings

In 2018, Sabrina suffered an acute ischemic stroke and was treated by Genesis Hospital. In July, Sabrina was admitted to care by Select Specialty Hospital, a long-term acute care hospital. A breathing tube (tracheostomy "trach" tube) enabled her to breathe. At the beginning of August, Sabrina had a mucous plug, which caused her heart rate to drop, she was unresponsive, and the hospital had to bag mask her for oxygen. She was moved to the intensive care unit at Select Specialty Hospital. Issues developed with the first trach tube, and a second tracheostomy was performed on August 17 at Genesis Hospital. Sabrina was transported back to Select Specialty Hospital where she was housed in its intensive care unit.

At 7:55 p.m. on August 21, Sabrina was found nonresponsive and with no pulse. CPR restarted Sabrina's pulse, and she was put on a ventilator. The medical team responding to the emergency code situation was under the

---

[1] Willie was Sabrina's husband; Breanna is their daughter.

leadership of an advance registered nurse practitioner. The nurse practitioner listened to Sabrina's lungs and heard air movement, and the monitor showed 99% oxygen saturation. Twenty minutes later, the ventilator alarm went off, and the respiratory therapist took her off the ventilator and began using a bag to pump air through the trach tube. Around 8:15, the nurse practitioner called an on-call pulmonologist to discuss the situation and ask him to come in. The respiratory therapist testified at her deposition it was "very difficult" to bag due to the swelling, and the nurses were watching Sabrina's pulse and oximeter. At 8:35, the respiratory therapist tried to pass a suction catheter through the trach but couldn't because of swelling. The emergency team "assumed trach dislodged." The respiratory therapist, who was trained in emergency intubation, attempted but was unable to intubate due to the swelling in Sabrina's throat; the trach tube was still in place. The respiratory therapist opted to bag mask Sabrina—she did not want to replace the trach tube and risk creating a false track; air was successfully getting in through the mask ventilation. Sabrina's pulse dropped again. By 9:00, the responding nurses had restarted CPR compressions and then used a defibrillator to restart her heart.

At 9:15, the on-call doctor arrived and began intubation. Intubation normally takes the doctor ten to fifteen seconds, but that night, he noted it was a difficult intubation with a poor view, and it took him seven minutes to successfully intubate Sabrina, finishing at 9:26. The doctor noted he had been able to bag Sabrina through the trach tube before the intubation, so he considered her airway to be "patent." Once she was intubated, the defibrillator was used again, and then CPR.

However, the medical personnel were unable to revive Sabrina, and she was pronounced dead at 9:55 p.m. No autopsy was conducted.

The Harrises filed suit in July 2020, pleading professional negligence against Select, alleging the following "acts of negligence":[2]

> a. failing to properly train, supervise, and manage the staff, doctors, nurses and other health care professionals to recognize and diagnose the pulmonary distresses that Sabrina developed while she was a patient at [Select];
> b. failing to adequately train, supervise, manage the staff and nurses to implement and use a protocol procedure that would move and provide proper monitoring, maintenance, and care to a patient with a tracheostomy and related pulmonary issues so that these pulmonary issues would not be allowed to exacerbate and eventually cause death of Sabrina;
> c. failing to adequately train, supervise, and otherwise manage the staff, doctors, and other related health care professionals to avoid a routine tracheostomy causing fatal complications in Sabrina's pulmonary system;
> d. failing to adequately train nursing staff, doctors, and other hospital employees to recognize the symptoms of tracheostomy complications and related pulmonary distresses; and
> e. failing to maintain a safe environment with appropriate staffing to care for a patient with a tracheostomy and related pulmonary and health issues.

The Harrises concluded by seeking wrongful-death damages, stating,

> The Decedent, Sabrina Harris, died on August 21, 2018, from complications arising from the tracheostomy and care of the tracheostomy she received while in the care of [Select]. This action is being brought pursuant to the Iowa Code alleging the wrongful death in that Defendants, caused and/or led to the death of Sabrina.

The Harrises did not name any of Select's medical staff as defendants. Specifically, the Harrises did not plead that the respiratory therapist or any of the

---

[2] The Harrises also raised claims against Genesis Hospital and associated doctors but dismissed them without prejudice after a motion for summary judgment asserted the Harrises failed to designate an expert to criticize the care Genesis and its doctors provided.

bedside staff was medically negligent in their treatment of Sabrina. Select denied all allegations against them.

In July 2021, the Harrises served their designation of expert witnesses on Select, listing Dr. John Hyde, Ph.D. as an expert on hospital administration, respiratory therapist Katie Stehlik, and an otolaryngologist. Dr. Hyde's designation described his expected testimony as: "regarding standard of care, causation, and damages, including but not limited to the standard of care for hospital administrative responsibilities, which include but are not limited to education, staffing, reporting, and patient safety." Ms. Stehlik's designation stated "she is expected to testify regarding standard of care, causation, and damages, including but not limited to the standard of care regarding the roles and responsibilities of bedside providers maintaining an airway." The otolaryngologist—the expert witness who signed the certificate of merit for this action—was to testify on standard of care, causation, and damages. The disclosed otolaryngologist withdrew as an expert, and the Harrises did not designate a replacement expert or provide a report within the extension period granted by the court. On December 27, the Harrises filed a motion to designate a new expert in nursing and requested an extension; the court denied the motion and extension as far beyond the statutory 180-day deadline after the filing of the defendant's answer. *See* Iowa Code § 668.11 (2020)

In May 2022, Select filed a motion to strike Dr. Hyde as expert witness for seeking to offer opinions as to standard of care and treatment, when he is not a medical doctor, nurse, or respiratory therapist instead of limiting his opinion to hospital administration. At the same time, Select filed a motion for summary

judgment, asserting the Harrises had "no nursing expert to testify regarding standard of care or causation" and the designated respiratory therapist expert provided no causation opinion between Select's alleged negligence and Sabrina's death.

The Harrises resisted the summary judgment motion. A combined hearing was held, after which the court granted Select's motion to strike Dr. Hyde as an expert witness. Turning to Select's motion for summary judgment, the court found that, even without striking Dr. Hyde as witness, the Harrises did not establish a prima facie medical or institutional negligence claim. The court noted that of the three elements required for a prima facie claim—the applicable standard of care, violation of the standard of care, and a causal relationship between the violation and the harm alleged—Dr. Hyde did not establish the appropriate standard of care or establish actual causation instead of simple foreseeability. The court found the respiratory therapist's report equally unable to establish a prima facie case of professional negligence:

> [Ms. Stehlik] goes on to find it took Ms. Harris's caregivers over an hour to establish an airway but does not state if this time frame is a breach of the standard of care. She also does not establish if there was a violation of the standards referenced above. Nowhere in her report does she state what actions, or lack of actions, were taken by the respiratory therapists that would have constituted a violation of the standard of care. Stating they violated the standard because they could not establish an airway is vague and is not sufficient to establish that a violation occurred.
>
> She also does not state what the standard of care is for record-keeping and how the respiratory therapists violated this standard, only that they did violate the standard. Her report is vague and lacks specifics regarding what the standard of care is for respiratory therapists or how they breached the standard of care.
>
> Ms. Stehlik's causation opinions are also lacking. "Expert testimony is required to create a jury question on causation when the causal connection is not within the knowledge and experience of an

ordinary layperson." *Susie* [*v. Family Health Care of Siouxland, P.L.C.*, 942 N.W.2d 333, 337 (Iowa 2020)]. There must be evidence to support the violation that caused the harm alleged. And the closest she gets is stating the standard of care is to maintain an airway, and failure to maintain that airway caused Ms. Harris's death. This is circular reasoning and does not assist the fact finder in determining if the violation caused Ms. Harris's death. Further, she does not state that poor communication caused Ms. Harris's death.

The court held the Harrises could not "establish a prima facie case of medical negligence due to the lack of standard of care, violations of that standard, and causation testimony from their experts." The court granted Select's motion for summary judgment and dismissed the case.

The Harrises appeal.

## II.    Standard of Review

We review a grant of summary judgment for correction of errors at law. *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 800 (Iowa 2019). "Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law. We view the record in the light most favorable to the nonmoving party." *Id.* (internal quotation marks and citation omitted). "Summary judgment is proper when the plaintiff's claim lacks evidence to support a jury question on an essential element of the claim." *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010).

We review a district court ruling allowing or disallowing expert testimony for an abuse of discretion. *Id.*

## III.    Analysis

On appeal, the Harrises frame their claims as "professional negligence against the attending respiratory therapist and ordinary negligence against the

hospital for failure to train, staff, and otherwise supervise its employees." However, looking at the petition the Harrises filed, they made no specific claims against the respiratory therapist, all negligence assertions against Select are under the title "Professional Negligence," and these claims are limited to "failing to properly train, supervise, and manage" the staff, doctors, and employees of select. Our review is limited to the actual scope of the pleadings. *See Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 541 (Iowa 2022) ("[The plaintiffs are] bound by the allegations actually pleaded within the four corners of [their] petition."); Iowa R. Civ. P. 1.981(3) (directing the district court to grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

Select urges that several other theories advanced by the Harrises on appeal were not pleaded or argued below. These theories include ordinary common-law negligence, breach of contract, and corporate negligence. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). The Harrises' statements regarding error preservation simply noted a timely notice of appeal from the "final order entered in this case . . . and from all adverse rulings and orders therein." Simply filing a notice of appeal is insufficient to preserve error for review. *See* Thomas A. Mayes & Anuradha Vaitheswaran, *Error Preservation in Civil Appeals in Iowa: Perspectives on Present Practice*, 55 Drake L. Rev. 39, 48 (2006) ("While this is a common statement in briefs, it is erroneous, for the notice of appeal has nothing to do with

error preservation." (footnote omitted)). The Harrises did not file a reply brief showing error preservation in the record on these issues, and they are bound by the allegations actually pleaded in their petition. *Struck*, 973 N.W.2d at 541. To the extent these theories were neither raised nor decided by the district court, we will not address them. *See, e.g.*, *id.* at 542 (holding the plaintiff's professional negligence claims did not encompass ordinary negligence claims).

1. *Summary judgment standards.*

The Harrises argue the district court used the wrong standard in evaluating Select Specialty's motion for summary judgment, construing facts and inferences against them as the nonmoving party. They assert (1) Ms. Stehlik's expert report contained opinions on the standard of care for respiratory therapists and causation, and (2) "Dr. Hyde's opinions were sufficient to establish a prima facie case of institutional negligence." Select responds arguing the Harrises failed to present expert testimony establishing each element of institutional negligence and medical negligence. Select observes, "the [Harrises] presented no medical opinions within a reasonable degree of medical certainty as to how [Select] could have prevented the death or contributed to the same."

The burden is on Select to demonstrate the nonexistence of a material fact question. However, the Harrises, as the nonmoving party, may not rely on mere allegations in the pleadings but must set forth specific facts showing a genuine issue for trial. "If the nonmoving party cannot generate a prima facie case in the summary judgment record, the moving party is entitled to judgment as a matter of law." *Susie*, 942 N.W.2d at 336–37.

> To establish a prima facie case of medical malpractice, a plaintiff must produce evidence that (1) establishes the applicable standard of care, (2) demonstrates a violation of this standard, and (3) develops a causal relationship between the violation and the injury sustained. Ordinarily, evidence of the applicable standard of care—and its breach—must be furnished by an expert.

*Struck*, 973 N.W.2d at 539 (internal quotation marks and citations omitted). Given the allegations of negligence pleaded in the petition, the Harrises had to produce evidence of the standard of care to "train, supervise, and manage the staff" regarding patient care and medical complications and to "maintain a safe environment with appropriate staffing"; violations of those standards; and that the failure to train, supervise, and manage staff "caused and/or led to the death of Sabrina."

*2. Standard of care and violation of the standard of care.*

The district court found the Harrises experts did "not offer an appropriate standard of care, violation of that standard, or causation opinion." The report from the Harrises' respiratory therapist expert, Ms. Stehlik, focuses on the performance of the non-party respiratory therapist, not the pleaded claims. Although she reviewed Select's policies and procedures, she offered no opinion whether Select violated its standard of care to train, supervise, or manage beyond a short statement that Select's record keeping was inadequate and below the standard of care, and she made no causal link to the alleged wrongful death of Sabrina. She did not identify any training or credentialing deficiencies of the attending respiratory therapist that Select should have previously addressed which would have prevented the medical complications leading to Sabrina's death.

The Harrises' other expert on hospital administration, Dr. Hyde, addressed the pleaded claims more directly with a management and supervision viewpoint.[3] However, he offered three opinions which also failed to establish the three prongs necessary for medical negligence. First, Dr. Hyde stated the hospital had a duty to develop and mandate proper communications among caregivers, and there was a "lack of proper communication" surrounding the rapid response and emergency care given to Sabrina on August 21. Second, Dr. Hyde opined on the training and education of Select's staff, finding "a lack of training and knowledge testing in the area of difficult airway management training." Although he stated "a competent and adequately prepared . . . staff is the standard . . . and is clearly prescribed and mandated," he cited no standard from an administrative standpoint for an appropriate level of training Select should but did not require and/or provide. Finally, Dr. Hyde asserted Select should have enforced its contract with its provider to have a physician on site because the substitution of an advanced registered nurse practitioner "is contraindicated and violates the contractual performance duties." The bottom line for Dr. Hyde was, "When a facility such as Select . . . undertakes to provide care to patients such as Ms. Harris, there is an obligation and duty to properly train and educate their staff for such anticipated patient needs."

Viewing the reports of Ms. Stehlik and Dr. Hyde in a light most favorable to the Harrises, we agree with the district court that the Harrises failed to generate a

---

[3] Although Dr. Hyde's report was struck below, viewing the evidence in the light most favorable to the nonmoving party, we will consider his administrative opinions for purposes of our analysis.

genuine issue of material fact concerning the standard of care for the training, supervision, and management of Select's bedside providers. Dr. Hyde's opinions concerning communication, training and education, and staffing are simply too vague and conclusory to establish a prima facie case of institutional negligence. Similarly, Ms Stehlik's opinion that the staff's record keeping was below the standard of care does not establish what the standard of care for record keeping is. And Ms. Stehlik expresses no opinion concerning the standard of care of a hospital to train, supervise, or manage its staff.

*3. Causation.*

But even assuming the expert witness reports could establish a standard of care for institutional negligence and a breach of that standard by Select, the critical issue is whether Dr. Hyde and Ms. Stehlik provide a causal link to Sabrina's death. Causation has two components: scope of liability and cause in fact. *Asher v. Ob-Gyn Specialists, P.C.*, 846 N.W.2d 492, 498 (Iowa 2014) (applying general-negligence causation standards to medical negligence cases), *overruled in part on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). For scope of liability, "[a]n actor's liability is limited to those physical harms that result from the risks that made the actor's conduct tortious." *Thompson v. Kaczinski*, 774 N.W.2d 829, 838 (Iowa 2009). "To determine whether the defendant in fact caused the plaintiff's harm, we apply a 'but-for' test." *Garr v. City of Ottumwa*, 846 N.W.2d 865, 869 (Iowa 2014); *Berte v. Bode*, 692 N.W.2d 368, 372 (Iowa 2005) ("Under [the but-for] test, 'the defendant's conduct is a cause in fact of the plaintiff's harm if, but-for the defendant's conduct, that harm would not have occurred.'" (citation omitted)). The Harrises have the burden to generate

sufficient evidence to create a genuine issue of material fact on the issue of whether, but for a violation of the standard of care by Select, Sabrina would not have died. *See Susie*, 942 N.W.2d at 337.

First, to the extent the Harrises claim expert testimony is not required to prove the lack of an airway caused Sabrina to die, we disagree. "Expert testimony is required to create a jury question on causation when the causal connection 'is not within the knowledge and experience of an ordinary layperson.'" *Id.* Sabrina had a complicated medical history of recent stroke, high blood pressure, breathing issues, and previous pulse drops leading to her staying in the intensive care unit. She died after emergency treatment following an emergency code, when her blood pressure spiked, she had no pulse, and she was nonresponsive. The Harrises do not allege the emergency onset resulted from any actions of Select. No autopsy was completed to determine the medical cause of Sabrina's death; and the record submitted as evidence does not include a cause of death. The code medical record shows the responding nurses had significant problems maintaining Sabrina's heart rate in addition to the respiratory therapist's difficulty maintaining Sabrina's breathing. When asked why Sabrina died at a later deposition, the treating doctor answered, "I have no idea," noting she had been "perfectly fine and was ready to go home" until the code event suddenly began. Given the complexity of Sabrina's condition, her cause of death is clearly beyond the knowledge and experience of an ordinary lay juror.

Expert testimony was required to establish a causal link between the alleged institutional negligence of Select and Sabrina's death. "[T]he plaintiff must show something more than the evidence is consistent with the plaintiff's theory of

causation. The evidence must show the plaintiff's theory of causation is 'reasonably probable—not merely possible, and more probable than any other hypothesis based on such evidence.'" *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 792–93 (Iowa 2009) (citation omitted). "[T]he proof in the case must be such that the fact finder is not left to speculate about who the negligent culprit is." *Susie*, 942 N.W.2d at 337 (citation omitted). The Harrises did not present the necessary proof of but-for causation.

Concerning causation, Dr. Hyde concluded in his first opinion, "The failure to timely secure her airway and have the appropriate medical personnel on-site is gross in nature and has clear foreseeability of fatal consequences." He made similar conclusory statements of foreseeability in his remaining criticisms. Causation requires more than mere foreseeability; the harm must be factually caused by and within the range of harm risked by defendant's tortious conduct. *Thompson*, 774 N.W.2d at 837–38. Dr. Hyde's opinions concerning the foreseeability of fatal consequences may be relevant in determining the exercise of reasonable care and a breach of duty. *See Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 775 (Iowa 2013). But he did not state that, but for Select's inadequate training, supervision, and management, Sabrina probably would have lived—i.e. he did not offer an opinion on but-for causation. *See Berte*, 692 N.W.2d at 372.

Perhaps recognizing the weakness of Dr. Hyde's causation opinion, the Harrises fall back to Ms. Stehlik to fill in the gap. "[T]he 'probability' of causal connection necessary to generate a jury question need not come solely from one witness." *Susie*, 942 N.W.2d at 339 (citation omitted). But other than her criticism

of record keeping, Ms. Stehlik did not express an opinion on institutional negligence, and the closest she came to a causation opinion was, "The staff that were taking care of Ms. Harris did not or did not know how to care for a woman with a high-risk airway and were unable to respond in time to save her life." Ms. Stehlik's report did not connect the deficient record keeping to the harm here and did not assert Sabrina probably would have lived but for deficiencies in Select's training, supervision, and management.

The Harrises have not established the medical cause of death and have not created a genuine issue of material fact on the question of whether Select's actions or omissions in training, management, and supervision of its staff and environment caused or led to Sabrina's death. We do not require buzzwords like "reasonable degree of medical certainty." "[E]xpert testimony indicating *probability* or *likelihood* of a causal connection is sufficient to generate a question on causation." *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004) (emphasis in original). But viewing the reports in a light most favorable to the Harrises, the expert opinions fail to establish that but for inadequate training, education, or communication, it is more likely than not that Sabrina would have lived. On the record before us, a jury would be left to speculate about the factual cause of her death. *Susie*, 942 N.W.2d at 339-40 ("Susies failed to establish a prima facie case of causation. There is only speculative testimony in the record from which a jury could infer it was more likely than not that Sharon's arm would have been saved by administration of antibiotics.").

Without a causal connection, the Harrises cannot establish a prima facie case of medical negligence, and summary judgment was appropriate. *See*

*Dickens v. Associated Anesthesiologists, P.C.*, No. 07-1882, 2008 WL 3916454, at *3 (Iowa Ct. App. Aug. 27, 2008) ("In the absence of other evidence from which causation may be inferred, expert testimony indicating a malpractice defendant's fault possibly or could have caused an injury and resulting damages is not sufficient to satisfy the probability or likelihood standard.").

Because we have considered the entire summary judgment record, including Dr. Hyde's report, in determining the district court properly dismissed the Harrises' claims, we need not address whether the court abused its discretion in excluding Dr. Hyde as an expert witness.

**AFFIRMED.**